# ERIC T. HOPKINS *v.* MICHAEL J. O'CONNOR
## (SC 17743)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued April 18—officially released July 3, 2007

*Jeffrey W. Kennedy*, for the appellant (defendant).

*Joseph M. Merly*, for the appellee (plaintiff).

*Opinion*

KATZ, J. The plaintiff, Eric T. Hopkins, brought the present action against the defendant, Michael J. O'Connor, a Madison police officer, in his individual capacity, alleging that the defendant, after causing the plaintiff to be transported to Yale-New Haven Hospital for a psychiatric evaluation, falsely and maliciously had defamed him in a police incident report and unreasonably had published private information about that incident to the plaintiff's coworkers. The defendant moved for summary judgment, claiming that he is entitled to absolute immunity from suit because the statements at issue were in furtherance of a judicial proceeding, namely, a commitment proceeding. The trial court determined that, because a genuine issue of material fact existed as to whether "the defendant's conduct in taking the plaintiff into custody or any subsequent proceeding that occurred as a result . . . constituted a hearing before a tribunal performing a judicial function," the defendant had not established that he was entitled to absolute immunity and that summary judgment, therefore, was not appropriate. The defendant now appeals from that decision. We conclude that, although certain statements by the defendant were made within the scope of a judicial proceeding, the trial court properly denied the defendant's motion for summary judgment on the ground that the defendant was not entitled to absolute immunity in light of the specific allegations in the plaintiff's complaint. Accordingly, we affirm the trial court's decision.

The record discloses the following undisputed facts. On September 2, 2003, pursuant to General Statutes § 17a-503 (a),[1] the defendant took the plaintiff into involuntary custody and caused him to be transported to Yale-New Haven Hospital for a psychiatric evaluation based on the defendant's reasonable belief that the plaintiff was suicidal. The genesis of the decision to transport the plaintiff had been a telephone call to the Madison police department from the plaintiff's friend, Steven Shaw, an emergency medical technician at a Madison ambulance service, who informed the police that the plaintiff had threatened to kill himself. The plaintiff, who owned several firearms, recently had been placed on leave from his position as a correction officer for the department of correction. The defendant was dispatched to Shaw's place of employment and, following his determination that the plaintiff was in need of help, executed the written form mandated under § 17a-503 (a) prior to transporting the plaintiff. Later that day, the defendant prepared an incident report, pursuant to police department requirements, in which he stated that Shaw had told him that the plaintiff stated that he "was going to kill his [former] coworkers . . . and [then] shoot himself." The defendant also contacted the department of correction as part of his investigation to verify that the plaintiff was an employee and to apprise the department of correction that the plaintiff had been committed to a psychiatric facility because he was suicidal.

---

[1] General Statutes § 17a-503 (a) provides: "Any police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section. The officer shall execute a written request for emergency examination detailing the circumstances under which the person was taken into custody, and such request shall be left with the facility. The person shall be examined within twenty-four hours and shall not be held for more than seventy-two hours unless committed under section 17a-502."

The plaintiff thereafter commenced the present action against the defendant in his individual capacity, alleging that the defendant had committed: (1) defamation per se by falsely and maliciously stating in the incident report that the plaintiff had threatened to kill his coworkers; and (2) an invasion of privacy by the unreasonable publication of details of his private life in disclosing to persons at the department of correction that the plaintiff had been committed to a psychiatric facility because he was suicidal. The defendant filed an answer admitting that he had transported the plaintiff to the hospital, prepared an incident report, provided that report to the department of correction and spoken to a department of correction representative. He denied that he had acted falsely, maliciously or unreasonably. He also asserted six special defenses, including that he is shielded from suit by the doctrine of absolute immunity.

Thereafter, the defendant filed a motion for summary judgment, claiming that he is entitled to absolute immunity because his conduct occurred during his participation in a judicial proceeding. Specifically, he contended that his actions were merely the initial steps of a commitment proceeding and that the plaintiff's involuntary commitment to the hospital for a psychiatric evaluation was, therefore, a "judicial proceeding where the plaintiff was being protected from hurting himself and possibly putting the lives of others at risk." Additionally, he contended that the statements to the plaintiff's employer were "an integral part of his investigation in furtherance of the commitment proceeding." In support of his motion, the defendant submitted a number of exhibits, none of which, according to the trial court, demonstrated that "any subsequent proceeding that occurred as a result [of the defendant's actions] . . . constituted a hearing before a tribunal performing a judicial function."

Before reaching that conclusion, however, the trial court began with a brief synopsis of the pertinent legal principles that guided its analysis of the issue. First, the court cited to the "long-standing common law rule that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy." (Internal quotation marks omitted.) *Petyan* v. *Ellis*, 200 Conn. 243, 245–46, 510 A.2d 1337 (1986). Additionally, the court recognized that the absolute privilege that is granted to statements made in furtherance of a judicial proceeding extends to every step of the proceeding until final disposition. *Kelley* v. *Bonney*, 221 Conn. 549, 565–66, 606 A.2d 693 (1992). The court noted that the effect of an absolute privilege in a defamation action is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously. *Craig* v. *Stafford Construction, Inc.*, 271 Conn. 78, 84, 856 A.2d 372 (2004).

Turning to the case at hand, the court recognized that "[t]he judicial proceeding to which [absolute] immunity attaches has not been defined very exactly"; (internal quotation marks omitted) id.; and opined that an absolute privilege likely would apply to a Probate Court proceeding held to determine whether a person should be committed to a psychiatric facility. It concluded, however, that the evidence did not provide any basis that would enable it to conclude that "the events giving rise to the plaintiff's claims occurred before, during or after any such proceeding. Essentially, the only facts that are established by the evidence are that the defendant, a police officer, took the plaintiff into custody pursuant to § 17a-503 (a), because he had reasonable cause to believe that the plaintiff had psychiatric disabilities or was gravely disabled and in need of immediate care. Without more, however, these facts do not establish that the defendant's conduct occurred in the con-

text of a judicial proceeding to which absolute immunity applies. Such a scenario does not fit even the broadest definition of 'judicial proceeding . . . .' " In reaching its decision, the court turned to the language of § 17a-503, and reasoned that it "applies to actions taken *prior* to a commitment proceeding and, therefore, *prior* to a judicial proceeding. . . . Pursuant to this language, therefore, proof that the defendant took the plaintiff into custody is not, in and of itself, sufficient to establish the existence of a judicial proceeding." (Citation omitted; emphasis added.) Finally, the court remarked that the defendant's contention assumed that the issue of the plaintiff's involuntary commitment had been addressed by a court and that the safeguards of the commitment proceedings had attached, but concluded that the evidence did not demonstrate that any commitment proceeding had been held. Therefore, the trial court concluded that the defendant was not entitled to absolute immunity and, accordingly, denied his motion for summary judgment. This appeal followed.[2] We affirm the decision of the trial court, albeit on different grounds as to one of the two counts. See *Kelley* v. *Bonney*, supra, 221 Conn. 592 ("[w]here the trial court reaches a correct decision but on mistaken grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it" [internal quotation marks omitted]).

I

We begin with a brief discussion of our jurisdiction to consider this appeal, noting that, as a general rule, an interlocutory ruling may not be appealed pending the final disposition of a case. See *State* v. *Curcio*, 191 Conn. 27, 30, 463 A.2d 566 (1983) (right of appeal is

---

[2] The defendant appealed from the decision of the trial court to the Appellate Court, and we thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

purely statutory and "is limited to appeals by aggrieved parties from final judgments"). The denial of a motion for summary judgment ordinarily is an interlocutory ruling and, accordingly, is not a final judgment for purposes of appeal. "We previously have determined [however] that certain interlocutory orders have the attributes of a final judgment and consequently are appealable under [General Statutes] § 52-263." (Internal quotation marks omitted.) *Esposito* v. *Specyalski*, 268 Conn. 336, 345–46 n.13, 844 A.2d 211 (2004). We have recognized that the denial of a motion for summary judgment is immediately appealable when the motion is predicated upon a colorable claim of absolute immunity based on sovereign immunity. See *Shay* v. *Rossi*, 253 Conn. 134, 164–67, 749 A.2d 1147 (2000), overruled in part on other grounds by *Miller* v. *Egan*, 265 Conn. 301, 327, 828 A.2d 549 (2003). In so concluding, we observed "that the subjection of the state and federal governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds and property." (Internal quotation marks omitted.) Id., 165–66.

In *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 865 A.2d 1163 (2005), we found this rationale also to be applicable to the absolute immunity afforded participants in judicial and quasi-judicial proceedings. "Our determination is dictated by the underlying purpose of the immunity afforded at common law to those who provide information in connection with judicial and quasi-judicial proceedings, namely, that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements. . . . Put simply, absolute immunity furthers the public policy of encouraging participation and candor in judicial and quasi-judicial proceedings. This

objective would be thwarted if those persons whom the common-law doctrine was intended to protect nevertheless faced the threat of suit. In this regard, the purpose of the absolute immunity afforded participants in judicial and quasi-judicial proceedings is the same as the purpose of the sovereign immunity enjoyed by the state. Thus, for the same reason that the rejection of a colorable claim of sovereign immunity gives rise to an immediately appealable final judgment—that is, to protect against the threat of suit—so, too, does the rejection of a colorable claim of absolute immunity based upon participation in judicial and quasi-judicial proceedings." (Citation omitted; internal quotation marks omitted.) Id., 786–87. As in *Chadha*, the defendant's claim of absolute immunity in the present case is colorable because our case law consistently has recognized absolute immunity in connection with such proceedings. Accordingly, we conclude that the trial court's denial of the defendants' motion for summary judgment, which had been filed on the basis of colorable claim of absolute immunity, constitutes an appealable final judgment.

We next set forth the applicable standard of review. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing . . . that the party is . . . entitled to judgment as a matter of law. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Internal quotation marks omitted.) *Cantonbury Heights Condominium Assn., Inc.* v. *Local*

*Land Development, LLC*, 273 Conn. 724, 733, 873 A.2d 898 (2005). In addition, the determination of whether a commitment proceeding constitutes a judicial proceeding is a question of law over which our review is plenary. Whether particular conduct is by its nature part of or in furtherance of a judicial proceeding for the purposes of triggering absolute immunity, however, depends on the particular facts and circumstances of each case. *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 83–84. With this standard of review in mind, we turn to the defendant's claims on appeal.

The defendant contends that he is absolutely immune from suit because the statement contained in his incident report and the statement he made to the plaintiff's former employer, even if defamatory and invasive of the plaintiff's privacy, had been made in furtherance of a judicial proceeding, irrespective of whether such conduct preceded a formal adjudication. He points to the cases wherein we have held that a judicial proceeding includes "lunacy . . . proceedings"; (internal quotation marks omitted) id., 84; see *Kelley* v. *Bonney*, supra, 221 Conn. 566; and contends that the trial court improperly focused on whether the plaintiff ultimately was brought before a court in deciding whether he should be afforded absolute immunity. The defendant also contends that he should be absolutely immune from suit on public policy grounds. We conclude that, because the statement contained in his incident report fell within the scope of a judicial proceeding, the defendant ultimately may be protected by qualified or absolute immunity for that statement, but we further conclude that he is not entitled to immunity for his statement to persons at the department of correction.

## II

It is well settled that "communications uttered or published in the course of judicial proceedings are abso-

lutely privileged so long as they are in some way pertinent to the subject of the controversy." (Internal quotation marks omitted.) *Petyan* v. *Ellis*, supra, 200 Conn. 245–46. It is generally held that so-called "lunacy proceedings" are a judicial proceeding within the rule of absolute privilege. See *Jarman* v. *Offutt*, 239 N.C. 468, 472, 80 S.E.2d 248 (1954); 50 Am. Jur. 2d, Libel and Slander § 281 (2006); annot., 66 A.L.R. 1257 (1930); annot., 2 A.L.R. 1582 (1919). Indeed, we often have stated as much. See *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 84–85 ("The judicial proceeding to which [absolute] immunity attaches . . . includes any hearing before a tribunal which performs a judicial function, ex parte or otherwise, and whether the hearing is public or not. It includes, for example, lunacy, bankruptcy, or naturalization proceedings, and an election contest." [Internal quotation marks omitted.]); *Kelley* v. *Bonney*, supra, 221 Conn. 566 (same); *Petyan* v. *Ellis*, supra, 246 (same). Because of the significant procedural protections afforded in commitment proceedings,[3] and in the absence of any reason to differentiate that proceeding from the so-called "lunacy" proceedings, we conclude that commitment proceedings are judicial proceedings to which immunity attaches.[4]

---

[3] A hearing on a commitment application is adjudicated by the Probate Court; General Statutes §§ 17a-497 and 17a-498; wherein the respondent who is alleged to be mentally ill has, inter alia, the right to be present at the hearing, the right to appointed counsel and the right to cross-examine witnesses. General Statutes § 17a-498. The respondent also has the right to appeal from an adverse decision. General Statutes § 17a-525.

[4] Statutes governing commitment proceedings originated in an 1889 Public Act entitled "An Act concerning Insane Persons." Public Acts 1889, c. 162. Although there is no legislative history to the act, which was the genesis of our current scheme under part II of chapter 319a of the General Statutes, a review of the act indicates that it vested the Probate Court with jurisdiction over commitment proceedings and prescribed the procedures and protections attendant to such proceedings. See Public Acts 1889, c. 162, § 1 (definitions); id., § 2 (commitment power vested in Probate Court); id., § 3 (no one committed without order of probate judge); id., § 4 (commitment complaint and proceedings thereon); id., § 5 (requirement that certification by two physicians be filed in court); id., § 6 (commitment order); id., §§ 7

The scope of privileged communication extends not merely to those made directly to a tribunal, but also to those preparatory communications that may be directed to the goal of the proceeding. As this court previously has recognized: "The right of private parties to combine and make presentations to an official meeting and, as a necessary incident thereto, to prepare materials to be presented is a fundamental adjunct to the right of access to judicial and quasi-judicial proceedings. To make such preparations and presentations effective, there must be an open channel of communication between the persons interested and the forum, unchilled by the thought of subsequent judicial action against such participants; provided always, of course, that such preliminary meetings, conduct and activities are directed toward the achievement of the objects of the litigation or other proceedings." (Internal quotation marks omitted.) *Kelley* v. *Bonney*, supra, 221 Conn. 574; see also *Alexandru* v. *Dowd*, 79 Conn. App. 434, 438, 830 A.2d 702 ("It is well settled that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy. . . . The privilege applies also to statements made in pleadings or other documents prepared in connection with a court proceeding." [Citation omitted; internal quotation marks omitted.]), cert. denied, 266 Conn. 925, 835 A.2d 471 (2003). Similarly, the fact that the issue

through 10 (appeal and appeal procedure); id., § 11 (right of relative to convey insane person to asylum); id., §§ 12 and 13 (fees); id., § 14 (bond in appeals); id., § 15 (probate docket); id., § 16 (committed person's right to writ of habeas corpus); id., § 17 (act not applicable to persons convicted or charged with crime); id., § 18 (voluntary admission to asylum); id., § 19 (visit by patient's attorney or physician); id., § 20 (writing materials provided to asylum patient); id., § 21 (quarterly reports filed by asylum on statistics of patients); id., § 22 (inspection of asylums); id., § 23 (penalties for false statements); id., § 24 (misdemeanor offense for asylum keeper's violation of act). Thus, in its original form, it seems clear that, from its inception, this chapter dealt with a judicial proceeding.

of the plaintiff's commitment had not yet culminated in a Probate Court hearing at the time the communication was made is not dispositive. See *McManus* v. *Sweeney*, 78 Conn. App. 327, 335, 827 A.2d 702 (2003) (Recognizing that absolute privilege is available when the defamatory matter "has some reference to the subject matter of the proposed or pending litigation, although it need not be strictly relevant to any issue involved in it. . . . 3 Restatement [Second], [Torts] § 586, comment [c] [1977]." [Internal quotation marks omitted.]); see also *Ramstead* v. *Morgan*, 219 Or. 383, 394, 347 P.2d 594 (1959) (Noting that "[t]he fact that the complaint made by the defendant to the grievance committee did not eventuate in a formal hearing before a committee of the bar or before the Board of Governors does not preclude the application of the rule of absolute privilege. The privilege extends to pleadings and other papers made a part of a judicial or quasi-judicial proceeding even though such proceeding is in its preliminary stage and no formal judicial action has been taken."); 3 Restatement (Second), supra, § 587 (defining scope of privilege generally as follows: "[a] party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish false and defamatory matter of another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of a judicial proceeding in which he participates, if the matter has some relation to the proceeding").

Accordingly, we turn to the question of whether the communications that form the subject of the plaintiff's complaint were made as part of steps attendant to a commitment proceeding. Because the defendant points to § 17a-503 (a), the statute under which he acted, as establishing the requisite connection to a judicial proceeding, we turn first to that statute.

Section 17a-503 (a) is located in part II of chapter 319i of the General Statutes. Part II, entitled "Commitment. General Provisions," sets forth the procedures and certain protections attendant to commitment of persons with psychiatric disabilities to hospitals for persons with such conditions.[5] Section 17a-503 (a) specifically provides: "Any police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section. The officer shall execute a written request for emergency examination detailing the circumstances under which the person was taken into custody, and such request shall be left with the facility. *The person shall be examined within twenty-four hours and shall not be held for more than seventy-two hours unless committed under section 17a-502.*" (Emphasis added.)

General Statutes § 17a-502[6] in turn provides in relevant part: "(a) Any person who a physician concludes

---

[5] See, e.g., General Statutes § 17a-497 (vesting Probate Court with jurisdiction); General Statutes § 17a-498 (commitment procedures and respondent's rights in commitment proceedings before Probate Court); General Statutes § 17a-499 (court records of commitment proceedings); General Statutes § 17a-500 (confidentiality of records); General Statutes § 17a-502 (detention and commitment under emergency certificate and rights attendant to such procedures); General Statutes § 17a-504 (penalties for false statements regarding commitment).

[6] General Statutes § 17a-502 provides in its entirety: "(a) Any person who a physician concludes has psychiatric disabilities and is dangerous to himself or others or gravely disabled, and is in need of immediate care and treatment in a hospital for psychiatric disabilities, may be confined in such a hospital, either public or private, under an emergency certificate as hereinafter provided for not more than fifteen days without order of any court, unless a written application for commitment of such person has been filed in a probate court prior to the expiration of the fifteen days, in which event such commitment is continued under the emergency certificate for an additional fifteen days or until the completion of probate proceedings, whichever occurs first. In no event shall such person be admitted to or detained at

has psychiatric disabilities and is dangerous to himself

any hospital, either public or private, for more than fifteen days after the execution of the original emergency certificate, on the basis of a new emergency certificate executed at any time during the person's confinement pursuant to the original emergency certificate; and in no event shall more than one subsequent emergency certificate be issued within fifteen days of the execution of the original certificate. If at the expiration of the fifteen days a written application for commitment of such person has not been filed, such person shall be discharged from the hospital. At the time of delivery of such person to such hospital, there shall be left, with the person in charge thereof, a certificate, signed by a physician licensed to practice medicine or surgery in Connecticut and dated not more than three days prior to its delivery to the person in charge of the hospital. Such certificate shall state the date of personal examination of the person to be confined, which shall be not more than three days prior to the date of signature of the certificate, shall state the findings of the physician relative to the physical and mental condition of the person and the history of the case, if known, and shall state that it is the opinion of the physician that the person examined has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled and is in need of immediate care and treatment in a hospital for psychiatric disabilities. Such physician shall state on such certificate the reasons for his or her opinion.

"(b) Any person admitted and detained under this section shall be examined by a physician specializing in psychiatry within forty-eight hours of admission as provided in section 17a-545. If such physician is of the opinion that the person does not meet the criteria for emergency detention and treatment, such person shall be immediately discharged. The physician shall enter his findings in the patient's record.

"(c) Any person admitted and detained under this section shall be promptly informed by the admitting facility that such person has the right to consult an attorney, the right to a hearing under subsection (d) of this section, and that if such a hearing is requested or a probate application is filed, such person has the right to be represented by counsel, and that counsel will be provided at the state's expense if the person is unable to pay for such counsel. The reasonable compensation for counsel provided to persons unable to pay shall be established by, and paid from funds appropriated to, the Judicial Department, however, if funds have not been included in the budget of the Judicial Department for such purposes, such compensation shall be established by the Probate Court Administrator and paid from the Probate Court Administration Fund.

"(d) If any person detained under this section, or his or her representative, requests a hearing in writing, such hearing shall be held within seventy-two hours of receipt of such request, excluding Saturdays, Sundays and holidays. At such hearing, the person shall have the right to be present, to cross-examine all witnesses testifying, and to be represented by counsel as provided in section 17a-498. The hearing may be requested at any time prior

or others or gravely disabled, and is in need of immediate care and treatment in a hospital for psychiatric disabilities, may be confined in such a hospital, either public or private, under an emergency certificate as hereinafter provided for not more than fifteen days without order of any court, unless a written application for commitment of such person has been filed in a probate court prior to the expiration of the fifteen days, in which event such commitment is continued under the emergency certificate for an additional fifteen days or until the completion of probate proceedings, whichever occurs first. . . . (d) If any person detained under this section . . . requests a hearing in writing, such hearing shall be held within seventy-two hours of

to the initiation of proceedings under section 17a-498. The hearing shall be held by the court of probate having jurisdiction for commitment as provided in section 17a-497, and the hospital shall immediately notify such court of any request for a hearing by a person detained under this section. At the conclusion of the hearing, if the court finds that there is probable cause to conclude that the person is subject to involuntary confinement under this section, considering the condition of the respondent at the time of the admission and at the time of the hearing, and the effects of medication, if any, and the advisability of continued treatment based on testimony from the hospital staff, the court shall order that such person's detention continue for the remaining time provided for emergency certificates or until the completion of probate proceedings under section 17a-498.

"(e) The person in charge of every private hospital for psychiatric disabilities in the state shall, on a quarterly basis, supply the Commissioner of Mental Health and Addiction Services in writing with statistics which state for the preceding quarter, the number of admissions of type and the number of discharges for that facility. Said commissioner may adopt regulations to carry out the provisions of this subsection.

"(f) The superintendent or director of any hospital for psychiatric disabilities shall immediately discharge any patient admitted and detained under this section who is later found not to meet the standards for emergency detention and treatment.

"(g) Any person admitted and detained at any hospital for psychiatric disabilities under this section shall, upon admission to such hospital, furnish the name of his or her next of kin or close friend. The superintendent or director of such hospital shall notify such next of kin or close friend of the admission of such patient and the discharge of such patient, provided such patient consents in writing to such notification of his or her discharge."

receipt of such request, excluding Saturdays, Sundays and holidays. At such hearing, the person shall have the right to be present, to cross-examine all witnesses testifying, and to be represented by counsel as provided in section 17a-498. The hearing may be requested at any time prior to the initiation of proceedings under section 17a-498. The hearing shall be held by the court of probate having jurisdiction for commitment as provided in section 17a-497 . . . ." General Statutes §§ 17a-497 and 17a-498 in turn vest the Probate Court with jurisdiction over such commitment proceedings.

In light of the fact that a police officer's actions under § 17a-503 result in a person being detained in a psychiatric hospital for evaluation to determine whether further detention and ultimately commitment are proper, it is clear that statements made in the course of such actions are the first step in the "distinct possibility" of a judicial proceeding. *Wollam* v. *Brandt*, 154 Or. App. 156, 164, 961 P.2d 219 (1998). It would, in our view, make no sense to make the police officer's immunity dependent on the outcome of that evaluation and whether the psychiatrist determines that commitment is appropriate. Indeed, we note that, under § 17a-502, to which § 17a-503 (a) expressly refers, a person detained under an emergency certificate *prior to commitment* may obtain a hearing before the Probate Court to which all of the same procedural protections that are available in a formal commitment proceeding also attach, except the right to appeal. Compare footnotes 3 and 5 of this opinion. Accordingly, we conclude that a police officer's actions pursuant to § 17a-503 are sufficiently connected to a commitment proceeding to warrant absolute immunity.[7] In the present case, however, the basis for the

---

[7] The provision under which the defendant acted in the present case, § 17a-503 (a), was not included in the chapter pertaining to commitment proceedings until 1977. See Public Acts 1977, No. 77-595, § 7. The legislative history to this act is not illuminating as to intent with respect to this specific provision, but it explains in general terms that the proposed bill underlying the Public Act "revises the procedure for formal emergency and voluntary

plaintiff's action is not the statements made by the defendant in his written request for an emergency examination under § 17a-503. Rather, it is his statements in the incident report and to the department of correction. We therefore turn to each of those statements.

## A

We begin with the allegedly defamatory statement in the incident report. "A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him . . . . To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." (Citations omitted; internal quotation marks omitted.) *Cweklinsky* v. *Mobil Chemical Co.*, 267 Conn. 210, 217, 837 A.2d 759 (2004). As this court has stated on several occasions, and as the trial court recognized, if, however, the communications are uttered or published in the course of judicial proceedings, even if they are published falsely and maliciously, they nevertheless are absolutely privileged provided they are pertinent to the subject of the controversy. *Kelley* v. *Bonney*, supra, 221 Conn. 565.

"The policy underlying the privilege is that in certain situations the public interest in having people speak

commitment of mentally ill persons. It revises the procedures of Probate Court concerning commitments and expands the responsibilities of the [s]tate agencies . . . ." 20 S. Proc., Pt. 10, 1977 Sess., pp. 3915–16, remarks of Senator Robert D. Houley. "This bill is designed to provide safeguards against the arbitrary commitment of individuals alleged to be mentally ill and seeks to [e]nsure treatment of all seriously mentally ill persons with requiring actual evidence of prior dangerous acts before commitment." 20 H.R. Proc., Pt. 14, 1977 Sess., p. 5781, remarks of Representative Ernest Abate.

freely outweighs the risk that individuals will occasion-
ally abuse the privilege by making false and malicious
statements." (Internal quotation marks omitted.) *Pet-
yan* v. *Ellis*, supra, 200 Conn. 246. The rationale underly-
ing the privilege is grounded upon the proper and
efficient administration of justice. 50 Am. Jur. 2d, Libel
and Slander § 299 (1995). Participants in a judicial pro-
cess must be able to testify or otherwise take part
without being hampered by fear of defamation suits.
Id. Therefore, in determining whether a statement is
made in the course of a judicial proceeding, "it is
important to consider whether there is a sound public
policy reason for permitting the complete freedom of
expression that a grant of absolute immunity provides."
*Kelley* v. *Bonney*, supra, 221 Conn. 567. In making that
determination, the court must decide as a matter of
law whether the allegedly defamatory statements are
sufficiently relevant to the issues involved in a proposed
or ongoing judicial proceeding, so as to qualify for the
privilege. The test for relevancy is generous, and "judi-
cial proceeding" has been defined liberally to encom-
pass much more than civil litigation or criminal trials.
Id., 566–67.

In the present case, the trial court reasoned that an
absolute privilege likely would apply to a Probate Court
proceeding to determine whether a person should be
committed to a psychiatric facility under § 17a-502, but
concluded that the evidence did not provide any basis
that would enable it to conclude that the events that
gave rise to the plaintiff's claims occurred before, dur-
ing or after any such proceeding. Because he had pro-
vided an uncontradicted affidavit attesting that the
incident report he prepared following his delivery of
the plaintiff to the hospital was mandated by police

department procedures,[8] however, the defendant claims that the report was made pursuant to and in furtherance of a commitment proceeding; in other words, it was a mandatory step in the process of the plaintiff's commitment, should a court so order. Accordingly, he claims that the trial court improperly interpreted the conduct prescribed under § 17a-503—transportation of a person involuntarily for a psychiatric examination—in isolation from § 17a-502—commitment proceedings subsequent to psychiatric examination—thereby failing to appreciate that "the defendant's actions were part of a process." Citing to *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 78, the defendant reasons that whether he is afforded absolute immunity should not depend upon whether the plaintiff ultimately was brought before a court. As he points out, in *Craig*, we deemed the citizen complaint alleging police misconduct absolutely privileged independent of whether the police department later took disciplinary action against the officer. Id., 93. Therefore, regardless of whether the plaintiff ultimately was committed to a psychiatric hospital,[9] the defendant contends that the trial court should have focused on the *process*, in this case, the mandatory report pursuant to § 17a-503, which was an essential step in the plaintiff's involuntary commitment.

We find the defendant's reasoning persuasive. As we explained in part I of this opinion, merely because the

[8] The defendant attested in his affidavit: "It is standard protocol in the Madison [p]olice [d]epartment for a case incident report to be drafted in situations involving threats of suicide by an individual and threats of harm to others."

[9] As part of his motion for summary judgment, the defendant submitted a transcript of Shaw's deposition, wherein Shaw testified that the plaintiff had telephoned him and related that he had been committed and was being transferred to Mount Sinai Hospital in Hartford. The plaintiff did not dispute this history either in his opposition to the defendant's motion for summary judgment or at the hearing on that motion. Because the trial court made no findings as to this specific evidence and because we conclude that a formal commitment proceeding is not required before the protections of absolute immunity attach, we afford no significance to this evidence.

mandatory police incident report was a preliminary step does not alter its fundamental nature. See *Kelley* v. *Bonney*, supra, 221 Conn. 574; *Alexandru* v. *Dowd*, supra, 79 Conn. App. 438. Similarly, the fact that the issue of the plaintiff's commitment had not yet culminated in a Probate Court hearing was not dispositive. See *McManus* v. *Sweeney*, supra, 78 Conn. App. 335; *Ramstead* v. *Morgan*, supra, 219 Or. 394. It is significant that, in order for the defendant to commence the commitment process, he was required under police department procedures to prepare this report. See footnote 8 of this opinion. Presumably, this report would duplicate the allegations set forth in the "written request for emergency examination detailing the circumstances under which the person was taken into custody" mandated under § 17a-503 (a), which we already have concluded would be covered by absolute immunity. Should the report meaningfully differ from that written request, it also would bear a connection to a potential commitment proceeding because it could be used during such a proceeding as evidence, or for purposes of examining or impeaching the defendant. Cf. *Carradine* v. *State*, 511 N.W.2d 733, 736 (Minn. 1994) (Citing as part of the rationale for immunity for preparation of the police arrest report: "[T]he report typically is useful not only to the [police] officer's departmental superiors but also to the prosecutor in determining whether to charge the arrestee and, if so, what offense(s) to charge . . . . [T]he police report often plays a significant role in the trial of a criminal defendant, with the prosecutor using the report to refresh the officer's recollection and with defense counsel using the report to cross-examine and attempt to impeach the officer . . . .").

Were our analysis to end here, we would conclude that the defendant's preparation of a mandatory report in connection with the statutory scheme governing the plaintiff's involuntary commitment is part of a judicial

proceeding falling within the rule of absolute privilege. Our analysis, however, does not end here. Our review of other pertinent provisions in the statutory scheme governing commitment proceedings has led us to General Statutes § 17a-504, which provides: "Any person who wilfully and maliciously causes, or attempts to cause, or who conspires with any other person to cause, any person who does not have psychiatric disabilities to be committed to any hospital for psychiatric disabilities, and any person who wilfully certifies falsely to the psychiatric disabilities of any person in any certificate provided for in sections 17a-75 to 17a-83, inclusive, 17a-450 to 17a-484, inclusive, 17a-495 to 17a-528, inclusive, 17a-540 to 17a-550, inclusive, 17a-560 to 17a-576, inclusive, and 17a-615 to 17a-618, inclusive, and any person who, under the provisions of said sections relating to persons with psychiatric disabilities, wilfully reports falsely to any court or judge that any person has psychiatric disabilities, shall be fined not more than one thousand dollars or imprisoned not more than five years or both."[10] This provision, which imposes criminal liability, raises a question as to how it impacts our policy underly-

---

[10] The penalties in § 17a-504 for conspiring to cause a person to be committed who is not under a psychiatric disability and for falsely certifying or making a false statement to a judge or court that a person is under a psychiatric disability have existed in their essential form since 1889. Public Acts 1889, c. 162, § 23, provides: "Every person who wilfully conspires with any other person unlawfully to commit to an asylum any person who is not insane, and any person who shall wilfully and falsely certify to the insanity of any person in any certificate made and filed as provided for in this act, and any person who, under the provisions of sections 487 and 3683 and 3692 of the general statutes, shall wilfully and falsely report to any court or judge that any person is insane, shall be punished by a fine not exceeding one thousand dollars, or by imprisonment in the state prison not exceeding five years, or both." In the 1889 act, any person could file a complaint in the Probate Court to commence commitment proceedings. See Public Acts 1889, c. 162, § 4. As we previously have noted in footnote 4 of this opinion, there is no legislative history to the 1889 Public Act, however, to determine specifically whether the legislature intended for this provision to abrogate applicable common-law immunity.

ing the privilege that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements.

To answer that question, we turn first to whether the legislature intended to abrogate the common law. Under well established rules of statutory construction, "[w]hile the legislature's authority to abrogate the common law is undeniable, we will not lightly impute such an intent to the legislature. . . . Thus, [w]hen a statute is in derogation of common law . . . it should receive a strict construction and is not to be extended, modified, repealed or enlarged in its scope by the mechanics of [statutory] construction. . . . In determining whether or not a statute abrogates or modifies a common law rule the construction must be strict, and the operation of a statute in derogation of the common law is to be limited to matters clearly brought within its scope. . . . Although the legislature may eliminate a common law right by statute, the presumption that the legislature does not have such a purpose can be overcome only if the legislative intent is clearly and plainly expressed. . . . The rule that statutes in derogation of the common law are strictly construed can be seen to serve the same policy of continuity and stability in the legal system as the doctrine of stare decisis in relation to case law." (Internal quotation marks omitted.) *Chadha* v. *Charlotte Hungerford Hospital*, supra, 272 Conn. 788–89; *Alvarez* v. *New Haven Register, Inc.*, 249 Conn. 709, 715, 735 A.2d 306 (1999).

Although through § 17a-504 the legislature imposed criminal sanctions against anyone who wilfully and maliciously attempts, causes or conspires to have someone committed who does not have psychiatric disabilities, we cannot conclude that the language of the legislature plainly and unambiguously reflects *clear* legislative intent to abrogate the common-law absolute

immunity applicable to statements made in connection with commitment proceedings. Indeed, were we to conclude otherwise, we not only would be construing a statute in derogation of the common law, but we also would be creating a liability where formerly none existed. *Vitanza* v. *Upjohn Co.*, 257 Conn. 365, 381, 778 A.2d 829 (2001). Therefore, construing § 17a-504 strictly as we must, we conclude that the statute is limited to matters clearly brought within its scope, and accordingly, bears no relation to civil liability.

Our interpretive journey, however, is not yet finished, because we recognize that it is illogical to punish someone criminally for engaging in certain conduct but protect them civilly *absolutely* and under all circumstances for the same behavior. In other words, we recognize that the policy reflected in § 17a-504 is inconsistent with the common-law absolute immunity otherwise applicable to statements made in connection with the commitment proceedings. We therefore conclude that we reasonably cannot give effect both to the imposition of criminal liability that this provision explicitly provides, on the one hand, and to the absolute immunity existing at common law, on the other. Accordingly, although we do not read § 17a-504 as an expression of the legislature's intent to abrogate absolute immunity for defamatory documents prepared in connection with a commitment proceeding, "it is well established that 'statutes are a useful source of policy for common-law adjudication, particularly when there is a close relationship between the statutory and common-law subject matters.' *DeMaria* v. *DeMaria*, 247 Conn. 715, 721, 724 A.2d 1088 (1999); see *Fahy* v. *Fahy*, 227 Conn. 505, 514, 630 A.2d 1328 (1993); see also *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 580–86, 657 A.2d 212 (1995); *New England Savings Bank* v. *Lopez*, 227 Conn. 270, 281–82, 630 A.2d 1010 (1993); *Olean* v. *Treglia*, 190 Conn. 756, 762, 463 A.2d 242 (1983); *Conference*

*Center Ltd.* v. *TRC*, 189 Conn. 212, 225, 455 A.2d 857 (1983); *Hamm* v. *Taylor*, 180 Conn. 491, 494–95, 429 A.2d 946 (1980). [Indeed, as we recently have noted] '[s]tatutes are now central to the law in the courts, and judicial lawmaking must take statutes into account virtually all of the time . . . . Hardly ever is a statute now regarded as a candidate for narrow construction because it may be in derogation of the common law. More often, the issue is rather to what extent a statute *is itself a source of policy for consistent common law development.'* . . . E. Peters, 'Common Law Judging in a Statutory World: An Address,' 43 U. Pitt. L. Rev. 995, 998 (1982); see generally J. Landis, 'Statutes and the Sources of Law,' Harvard Legal Essays (R. Pound ed. 1934) p. 213; G. Calabresi, A Common Law for the Age of Statutes (1982)." (Emphasis in original.) *C & J Builders & Remodelers, LLC* v. *Geisenheimer*, 249 Conn. 415, 419–20, 733 A.2d 193 (1999). We consider this adjudicative technique to be appropriate in the present case.

In light of the fact that § 17a-504 proscribes certain *malicious* conduct in connection with a commitment proceeding, we are mindful that a showing of such intent is consistent with a qualified immunity. We previously have held that the malice required to overcome a qualified privilege in defamation cases is malice in fact or actual malice. See, e.g., *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 28, 662 A.2d 89 (1995) ("[w]hether the privilege was abused . . . depends upon whether there was malice in fact" [internal quotation marks omitted]); *Hassett* v. *Carroll*, 85 Conn. 23, 35–36, 81 A. 1013 (1911) ("[o]ne publishing defamatory words under a qualified or conditional privilege is only liable upon proof of express malice"). We can perceive no reason, and the parties have provided us with none, to apply a different definition of malice in the context of this case. Therefore, consistent with

the policy expressed in § 17a-504 and our jurisprudence on malice, we conclude that it is appropriate to afford only a qualified immunity to persons acting pursuant to § 17a-503 if their conduct falls within the proscriptions against malicious conduct under § 17a-504. See *Chadha* v. *Charlotte Hungerford Hospital*, supra, 272 Conn. 790 (noting that distinction between qualified immunity and absolute immunity is that persons protected by latter immunity are not liable for malicious "conduct and statements"). Provision of only qualified immunity in some areas that have a connection to the judicial process is not a total anomaly. See *Malley* v. *Briggs*, 475 U.S. 335, 340–45, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) (complaining witness who initiates prosecution and procures issuance of arrest warrant has only qualified immunity at common law and police officer who submits affidavit for arrest warrant has only qualified immunity for purposes of 42 U.S.C. § 1983); *Pierson* v. *Ray*, 386 U.S. 547, 557, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967) (police officer sued for false arrest under 42 U.S.C. § 1983 has only qualified immunity).

Turning to the pleadings in the present case, the plaintiff alleges that the defendant "falsely and maliciously" included a statement in his report that Shaw had reported that the plaintiff threatened to kill his coworkers. The defendant admitted including the statement in his report, but denied that he had acted falsely and maliciously. "Actual malice requires that the statement, when made, be made with actual knowledge that it was false or with reckless disregard of whether it was false. . . . A negligent misstatement of fact will not suffice; the evidence must demonstrate a purposeful avoidance of the truth." (Citations omitted; internal quotation marks omitted.) *Abdelsayed* v. *Narumanchi*, 39 Conn. App. 778, 781, 668 A.2d 378 (1995), cert. denied, 237 Conn. 915, 676 A.2d 397, cert. denied, 519 U.S. 868, 117 S. Ct. 180, 136 L. Ed. 2d 120 (1996). "Malice in fact is

sufficiently shown by proof that the publications were made with improper and unjustifiable motives." *State v. Whiteside*, 148 Conn. 208, 212, 169 A.2d 260, cert. denied, 368 U.S. 830, 82 S. Ct. 52, 7 L. Ed. 2d 33 (1961); see also *Bleich v. Ortiz*, 196 Conn. 498, 504, 493 A.2d 236 (1985). The pleadings in this case, though sparse, use the talismanic language of malice and, accordingly, state a cause of action. In so doing, the plaintiff has insulated himself, for the moment,[11] from summary judgment because, generally speaking, "[a]lthough the ultimate determination of whether qualified immunity applies is ordinarily a question of law for the court, when . . . there are unresolved factual issues material to the applicability of the defense . . . resolution of those factual issues is properly left to the jury. *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994) [cert. denied, 513 U.S. 1076, 115 S. Ct. 721, 130 L. Ed. 2d 627 (1995)]; *Warren v. Dwyer*, [906 F.2d 70, 76 (2d Cir.), cert. denied, 498 U.S. 967, 111 S. Ct. 431, 112 L. Ed. 2d 414 (1990)]. . . . *Mulligan v. Rioux*, [229 Conn. 716, 729, 643 A.2d 1226 (1994), on appeal after remand, 38 Conn. App.

---

[11] We note that, unless the plaintiff can demonstrate that the defendant's statement was made with the malicious intent of achieving the proscribed result under § 17a-504, the defendant is entitled to absolute immunity. We further note that when allegations are conclusory, they do not, themselves, equate to a factual showing that the defendants' actions were taken with malice. "Mere statements of legal conclusions . . . and bald assertions, without more, [generally] are insufficient to raise a genuine issue of material fact capable of defeating summary judgment." (Citation omitted.) *Wadia Enterprises, Inc. v. Hirschfeld*, 27 Conn. App. 162, 170, 604 A.2d 1339, aff'd, 224 Conn. 240, 618 A.2d 506 (1992). Instead, the plaintiff must plead specific facts, which, if true, would allow a fact finder to reach the conclusion that the defendant did indeed act with malice. In the present case, because the defendant's motion for summary judgment reasonably was predicated on the defense of absolute immunity traditionally afforded to judicial proceedings, and the issue of qualified immunity had not emerged in light of our well established common-law jurisprudence regarding judicial proceedings, the sufficiency of the plaintiff's pleadings regarding malice was not raised. Therefore, we do not decide the propriety of the trial court's denial of summary judgment on that basis and we leave that opportunity for another day should the issue emerge later in the course of this litigation.

546, 662 A.2d 153 (1995)]." (Internal quotation marks omitted.) *Ham* v. *Greene*, 248 Conn. 508, 525–26, 729 A.2d 740, cert. denied, 528 U.S. 929, 120 S. Ct. 326, 145 L. Ed. 2d 254 (1999). Accordingly, as to the first count, we affirm the trial court's decision denying the defendant's motion for summary judgment.[12]

B

We turn next to the second count, wherein the plaintiff alleges that the defendant unreasonably published

[12] It is important to note that, in the present case, the parties have not claimed that the question of whether the defendant is entitled to absolute immunity is informed by policy considerations separate and apart from those embedded in the judicial proceeding contemplated by the specific statutory scheme at issue and whether the defendant's statements were made in the course of that proceeding. For purposes of the present case, therefore, we do not consider any such separate policy considerations. Furthermore, as we have acknowledged, the judicial proceeding to which the immunity attaches has not been defined with precision. That decision in any given case will depend on many factors, including the nature of the function assigned to the police officer and the relationship of the statements to the performance of that function. In this case, the defendant was acting pursuant to § 17a-503, serving less in a law enforcement capacity than in a health and safety capacity, as evidenced by the fact that the statement at issue in this case *followed* the defendant's written request for an emergency examination under § 17a-503. Additionally, the presence of other safeguards against any abuse of power by the officer, which are provided by the unique statutory scheme at play in this case—such as immediate psychiatric evaluation—weighs heavily as a factor that informs the policy considerations relevant to the question of whether absolute immunity should attach. See *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 568, 663 A.2d 317 (1995) ("[a] major consideration in allowing absolute immunity for prosecutors has been the recognition that disciplinary procedures exist to regulate prosecutorial misconduct"). Accordingly, although we have concluded that the defendant in the present case otherwise would be afforded absolute immunity were it not for § 17a-504, we caution against any extension of the limited holding in this case to other contexts wherein the competing consideration may not yield the same result in the balance. See *Mozzochi* v. *Beck*, 204 Conn. 490, 495, 529 A.2d 171 (1987) (providing attorneys, as officers of court, absolute immunity from liability for allegedly defamatory communications in course of judicial proceedings, but concluding that "[f]or other causes of action, however, the exigencies of the adversary system have not been deemed to require absolute immunity for attorneys").

details of the plaintiff's private life by improperly disclosing to persons working for the department of correction that the plaintiff had been committed to a psychiatric facility because he was suicidal. The defendant contends that this conduct was also part of the judicial proceeding that gave rise to absolute immunity. We disagree.

Although "judicial proceeding" has been defined liberally, encompassing much more than civil litigation or criminal trials; *Kelley* v. *Bonney,* supra, 221 Conn. 566; the communication by the defendant to the plaintiff's supervisors or fellow workers cannot fall within even the most expansive definition of that term. The decision to inform others, unconnected with the process of the plaintiff's commitment, even if properly motivated out of concern for their safety, was in no way directed toward the achievement of the objects of litigation or any other proceedings. Because that communication was not made pursuant to or in furtherance of a commitment proceeding, the trial court properly concluded that the defendant was not entitled to immunity on that basis.

The defendant also claims, however, that he is entitled to absolute immunity on public policy grounds. Specifically, he claims that allowing a potential civil action would undermine the strong public policy of encouraging professionals to report concerns regarding the safety of others posed by the threat of violence against them. We decline to address the defendant's public policy argument because it is premature. Such questions require not only a legal determination of whether police officers have a duty to warn generally, but also require predicate factual findings to determine whether the specific facts would give rise to such a duty, should one exist. See *Fraser* v. *United States,* 236 Conn. 625, 626, 674 A.2d 811 (1996) (concluding in light of extensive stipulation of facts that it was proper "in the circumstances presented herein, [to determine

whether] psychotherapists undertaking the treatment of a psychiatric outpatient assumed a duty to exercise control over the patient to prevent the patient from committing an act of violence against a third person"). Accordingly, we conclude that the trial court properly denied the defendant's motion for summary judgment on the second count of the complaint.

The decision is affirmed.

In this opinion the other justices concurred.