******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RAFAEL ARIAS
(SC 19587)

Rogers, C. J., and Palmer, Zarella, McDonald, Espinosa, Robinson and Vertefeuille, Js.

*Argued April 7—officially released July 26, 2016*

*Stephan E. Seeger*, with whom was *Igor Kuperman*, for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *David I. Cohen*, former state's attorney, and *Paul J. Ferencek*, senior assistant state's attorney, for the appellee (state).

*Opinion*

VERTEFEUILLE, J. The defendant, Rafael Arias, was convicted following a jury trial of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1) and sexual assault in the third degree in violation of General Statutes § 53a-72a. In his appeal, the defendant challenges his conviction on three grounds. First, he claims that the trial court improperly denied his motion to suppress statements that he made at the police station because he was not advised of his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Second, he argues that the trial court improperly admitted evidence of uncharged sexual misconduct under *State* v. *DeJesus*, 288 Conn. 418, 476–77, 953 A.2d 45 (2008), to show that he had a propensity to commit aberrant and compulsive sexual misconduct. Finally, the defendant argues that the trial court's application of this court's decision in *DeJesus* and the relevant revision of § 4-5 (b) of the Connecticut Code of Evidence; see footnote 2 of this opinion; violated his right to equal protection of the law under the state and federal constitutions. We disagree with all three claims.

The jury reasonably could have found the following relevant facts. The defendant managed a dental office and hired the victim, M, as a dental assistant. The defendant began making inappropriate comments to M, saying that he would like to kiss her lips and telling her how pretty she looked. He frequently touched her hair, put his arms around her and asked her out for lunch and dinner. Several months after M started working for the dental practice, the defendant loaned M $400 for car repairs. When M was able to reimburse the defendant, she left a $400 money order on his desk enclosed in a card. After the defendant received the card, he hugged M, thanked her for repaying him and asked her to follow him to his car because he needed to talk to her. M testified that as she and the defendant reached the corridor near the elevator, the defendant pushed her up against the wall and started to kiss her. The defendant put his hand under M's shirt and grabbed her breasts and put her hand on top of his pants. The defendant then put his hand inside M's pants and inserted the tip of his finger into her vagina. M eventually broke free and went into the bathroom.

M contacted the police the following morning. She met with David Hudyma, a detective with the Norwalk Police Department, and gave a written statement. The defendant later made a written statement to Hudyma acknowledging that the sexual contact had occurred, but claiming that it was consensual. The defendant subsequently was arrested and charged with one count of sexual assault in the first degree and one count of sexual assault in the third degree. A jury found the defendant guilty of both counts and the defendant now appeals

from the judgment of conviction rendered in accordance with the verdict.[1] Further detailed facts will be set forth as necessary.

## I

### MOTION TO SUPPRESS

The defendant first claims that the trial court improperly denied his motion to suppress his statements to the police. The following additional facts are relevant to this claim. Before trial, the defendant filed a motion to suppress, claiming that his oral and written statements to the police should not be admitted at trial because the police failed to advise him of his *Miranda* rights. During a hearing on the motion, the state called Hudyma, who testified that he met M the day after the alleged incident and obtained her statements and the defendant's cell phone number. When Hudyma called the defendant to schedule a time to discuss M's complaint, the defendant stated that he was already in the lobby of the Norwalk Police Department and that he was ready to discuss M's complaint. Hudyma met the defendant in the lobby and brought him to an interview room. Hudyma did not handcuff the defendant, tell him that he could not leave or restrain him in any way.

Hudyma and the defendant discussed the complaint for approximately forty-five minutes. During the conversation, the defendant showed Hudyma a text message on his cell phone. Because the text was in Spanish, another officer took the cell phone for approximately ten minutes to translate the text.

After the defendant agreed to provide a written statement, Hudyma brought him to a computer to type his statement and then left the room. The defendant testified that he was not aware of any officers being present while he typed his statement. Hudyma emphasized that he did not close or lock the door to the room as the defendant prepared his statement. Immediately after the defendant signed his statement, Hudyma walked him downstairs and the defendant left the police station. In total, the defendant was at the police station for approximately one hour.

The defendant testified that he went to the police station to discuss M's allegations, but that he did not expect to be asked questions. The defendant indicated that he had sixteen years of education and had no difficulty with the English language. He further testified that he passed several officers, some of whom were armed, as he walked from the lobby of the police station to the interview room.

Following the defendant's testimony, the state argued that the defendant was not in police custody when he gave his oral and written statements. Rather, the defendant "voluntarily went to the police station to tell his side of the story. . . . There was no compulsion here. . . . He was not locked in a room or forced into

any room. He wasn't forced to give a written statement. He wasn't forced to speak at all. . . . He was not given . . . warnings [pursuant to *Miranda*] . . . because . . . he was not in police custody."

Defense counsel responded that when the defendant visited the police station, he did not expect to be "barraged with questions." He claimed that when the defendant found himself in an interview room being questioned by Hudyma, he did not feel that he was free to leave, especially after his cell phone was taken and because there were numerous police officers in the vicinity.

The court found that the defendant, as an adult who reads and writes English, was aware of the allegations against him when he went to the police station voluntarily, and that "[a]ny objective analysis or view of the evidence in this case would indicate that he was not forced, compelled [or] required to give a statement. He was free to leave at all times. It's not an issue of interrogation. In order for this statement to be suppressed pursuant to the fourth amendment [to the United States constitution] it would have to be shown that [the defendant] was subject to custodial interrogation. There was no custody in this case, plain and simple." Accordingly, the court denied the motion to suppress.

On appeal, the defendant claims that his statements should have been suppressed because he was not advised of his rights under *Miranda* before he made them. Under our well established standard of review in connection with a motion to suppress, we will not disturb a trial court's finding of fact "unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Mitchell*, 296 Conn. 449, 458, 996 A.2d 251 (2010).

In order to establish that he was entitled to *Miranda* warnings, a defendant must show that he was in custody when he made the statements and that he made the statements in response to police questioning. *State* v. *Mangual*, 311 Conn. 182, 192, 85 A.3d 627 (2014). In assessing whether a person is in custody for purposes of *Miranda*, "the ultimate inquiry is whether a reasonable person in the defendant's position would believe that there was a restraint on [his] freedom of movement of the degree associated with a formal arrest. . . . Any lesser restriction on a person's freedom of action is not significant enough to implicate the core fifth amendment concerns that *Miranda* sought to address." (Citation omitted; footnote omitted; internal quotation marks omitted.) Id., 194–95.

In *Mangual*, we set forth "the following nonexclusive list of factors to be considered in determining whether a suspect was in custody for purposes of *Miranda*: (1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public." Id., 196–97.

After applying these factors to the present case, we conclude that the trial court properly determined that the defendant was not in custody when he made his statement. The record demonstrates that the defendant initiated the meeting with the police because he wanted to tell his side of the story. He was already inside the police station when Hudyma contacted him, and when Hudyma said he wanted to schedule a meeting time, the defendant opted to talk immediately. Nothing in the record suggests that the defendant was under any compulsion to speak to the police or to make a written statement at that point. Rather, the facts suggest that he could have left the police station at any time.

Not only did the defendant initiate contact with the police, but he was in the police station for only one hour and was never handcuffed or physically restrained. In fact, he was left entirely on his own when he typed his statement. Again, these facts do not suggest any restriction on the defendant's freedom of movement whatsoever, much less to the degree associated with a formal arrest. See *State* v. *Atkinson*, 235 Conn. 748, 760, 670 A.2d 276 (1996) (defendant failed to prove he was in custody after he voluntarily accompanied detectives to police station, was not handcuffed, arrested, detained against his will or subject to show of force, and used restroom unaccompanied).

Finally, although the defendant testified that he passed several armed police officers as he walked to the interview room, there is no suggestion that any of the officers displayed their weapons to the defendant or used any force before or during the questioning. To the contrary, the record shows that Hudyma was the only officer who had more than a passing interaction with the defendant, and he exercised little, if any, control over the defendant. Compare *State* v. *Mangual*, supra, 311 Conn. 201 (police exercised complete control over defendant and surroundings before, during and after questioning).

After considering all of the circumstances sur-

rounding the defendant's questioning, we cannot conclude that a reasonable person in the defendant's position would have believed that his freedom of movement was restrained to the degree associated with a formal arrest. Because the defendant was not in custody when he gave his statement, we further conclude that he was not entitled to an advisement of his rights under *Miranda.* Accordingly, the trial court properly denied his motion to suppress.

## II

### UNCHARGED MISCONDUCT EVIDENCE

In his second claim, the defendant argues that the trial court improperly admitted evidence of uncharged sexual misconduct to show that he had a propensity to engage in aberrant and compulsive sexual misconduct. See Conn. Code Evid. (Rev. to 2012) § 4-5 (b);[2] *State* v. *DeJesus,* supra, 288 Conn. 470–71. The following additional facts are relevant to this claim. Prior to trial, the state filed a notice of intent "to offer evidence that the defendant sexually harassed [M] on other occasions and routinely touched and fondled other female employees" at the dental office. The state contended that the evidence was relevant to the issues of motive, intent and malice and to show that the defendant had a propensity to engage in such conduct. The defendant filed an objection to the state's notice of intent and a motion in limine seeking to preclude the state from presenting this misconduct evidence. During a hearing to determine the admissibility of the evidence, the state asked M whether she had "ever see[n] the defendant engage in any kind of inappropriate behavior with other women in the office." M testified that she had seen the defendant engage in such behavior with other women, including A and G, indicating that she had seen the defendant touch their hair, rub their lower backs and put his arm around their waists.

Defense counsel argued that this evidence should not be admitted because it was too remote in time, dissimilar from the charged conduct and could lead the jury to infer that if the defendant had engaged in such conduct with other women, he must be guilty of the crimes alleged. Defense counsel also argued that this court's decision in *DeJesus* permits evidence of sexual misconduct to show propensity, but only in cases involving "grotesque sexual conduct" or "abhorrent sexual behavior and this isn't one of those cases."

The state responded that the alleged misconduct was not too remote in time and that all of the women were of similar status, working as dental assistants or as receptionists in a dental office that the defendant managed. The state also emphasized that it was not "basing the admissibility of this evidence strictly on *DeJesus,*" but was seeking to admit the evidence because it "contradicts the defendant's . . . statement that this was a

consensual encounter . . . [and] his statement that he knows when a woman doesn't want to be kissed."

Noting that its ruling was limited to the issue of whether M could testify as to conduct she had observed between the defendant and other women in the dental office, the court determined that this evidence was admissible. The court emphasized that the charged and uncharged misconduct were close in time, that the uncharged misconduct was similar enough to the charged conduct to be relevant, and that propensity evidence may be admitted in sexual assault cases pursuant to this court's decision in *DeJesus*. Finally, the court noted that testimony that the defendant had touched women's hair and backs "is not terribly prejudicial" and that the jury "might view that evidence as being a whole lot of nothing . . . ."

In response to the court's ruling, defense counsel argued that the court's construction of *DeJesus*, as applied to the defendant, violated his right to equal protection of the law. Defense counsel claimed that anyone who "has been charged with an offense that has to do with sex would . . . not [have] the same benefit as other defendants in terms of the specific rule [concerning] propensity."

M then testified before the jury, consistent with her testimony during the admissibility hearing. After M's testimony, several of her colleagues in the dental office testified that the defendant had touched them in some inappropriate way—by touching their hair, hugging them, putting his arm around them or rubbing their back. Two witnesses, A and G, also testified with respect to more egregious misconduct. A testified that the defendant had touched her breast and buttocks. G testified that she had seen the defendant grab M's "butt cheek." The defendant did not object to any of this testimony.

As the end of the presentation of evidence approached, the court met with counsel in chambers to discuss its charge to the jury. Thereafter, on the record, the court appeared to reconsider its prior ruling with respect to uncharged misconduct, noting that testimony from numerous witnesses indicating that the defendant touched their hair, put his hand around their waists and engaged in similar conduct, "appears to be circumstantial evidence of the defendant's intent and motive regarding sexual gratification . . . ." The court indicated that it would not mention this conduct during its final charge, but that it would refer to the more egregious evidence of misconduct toward A and G, and that the court planned to instruct that this testimony could be considered circumstantial evidence of the defendant's intent and motive. The court did not indicate that it would instruct the jury that evidence of alleged prior sexual misconduct could be considered to show that the defendant had a propensity to engage

in such conduct. Defense counsel did not respond to the court's request for comments nor did he object to the intended charge.

The court then instructed the jury in accordance with the described charge, noting that the defendant was not on trial for his alleged acts of prior sexual misconduct, but that such misconduct was being offered "to show or establish: (1) the defendant's intent to commit the crimes he allegedly committed against [M] that are charged in counts one and two of the information; (2) the defendant's motive to commit the crimes charged in counts one and two of the information; (3) the element of specific intent to obtain sexual gratification required to establish count [two] of the information [alleging sexual assault in the third degree]; [and] (4) the absence of mistake or accident on the part of the defendant when he committed the crimes charged in counts one and two of the information.

"You may consider such evidence and give it the weight you think it deserves, if any, in establishing the issues for which it is being offered by the state, i.e., the intent to commit the crimes charged, motive, intent to obtain sexual gratification and absence of mistake or accident.

"The testimony you heard from [A] and [G] regarding the defendant's other acts of sexual misconduct may also be used by you as circumstantial evidence of the crimes charged in the information."

The court gave the foregoing instruction on two occasions—first, during the state's case after all misconduct evidence had been admitted, and second, during its final charge to the jury. Defense counsel did not object to the instruction or take exception to the charge after it was given by the court on either occasion.

On appeal, the defendant claims that the trial court abused its discretion by admitting evidence of his prior sexual misconduct for the purpose of showing propensity under *DeJesus*. The defendant does not, however, challenge the trial court's admission of the misconduct evidence to show the defendant's intent, motive and the absence of mistake or accident. He thus implicitly concedes that the evidence properly was admitted for these purposes.

It is well established that "the inadmissibility of an evidential fact for one purpose does not render it inadmissible for some other purpose otherwise proper. 1 [J.] Wigmore, Evidence (2d Ed.) § 215. That evidence tends to prove the commission of other crimes by the accused does not render it inadmissible if it is otherwise relevant and material." *State* v. *Simborski*, 120 Conn. 624, 631, 182 A. 221 (1936). In the present case, although the trial court initially ruled that it would admit the misconduct evidence to show propensity under *DeJesus*, it subsequently determined that the evidence

was relevant and admissible to show intent, motive and the absence of mistake or accident.[3] The court instructed the jury in accordance with this subsequent determination and did not instruct that evidence of prior misconduct could be considered to show that the defendant had a propensity to engage in aberrant or compulsive sexual behavior. Although the court sought comments from counsel concerning its intended misconduct instruction, it did not receive any. In short, not only did the defendant fail to challenge the admission of the misconduct evidence to show intent, motive or absence of mistake at trial, but he does not challenge the admission of the evidence on these grounds in the present appeal. Having conceded that the evidence properly was admitted for at least one proper purpose, he cannot prevail on his claim that the trial court abused its discretion in admitting the evidence pursuant to *DeJesus*.

### III

### EQUAL PROTECTION

The defendant's final claim is that the trial court's application of the rule in *DeJesus*, which permits the admission of evidence of prior sexual misconduct to show propensity in sexual assault cases, violated his right to equal protection of the law under the state and federal constitutions.[4] The facts relevant to this claim are set forth in part II of this opinion. According to the defendant, the rule set forth in *DeJesus*, also codified at § 4-5 (b) of the Connecticut Code of Evidence; see footnote 2 of this opinion; treats persons accused of sex crimes differently than persons accused of all other crimes because it allows the admission of uncharged misconduct to show propensity in sex offense cases, thus undermining the presumption of innocence and interfering with the fundamental right to a fair trial.

Our review of the record indicates that it is not completely clear whether the trial court admitted evidence of uncharged sexual misconduct for the purpose of establishing that the defendant had a propensity to engage in sexual misconduct. The court never used the word "propensity" or similar words in its instructions to the jury. It did instruct the jury, however, that such evidence "may . . . be used by you as circumstantial evidence of the crimes charged in the information." Because it is possible that the jurors construed this instruction as permitting them to consider evidence of prior misconduct to establish propensity, we will address the defendant's claim that the trial court's application of § 4-5 of the Connecticut Code of Evidence violated his right to equal protection under the federal constitution.

To establish an equal protection violation, one must demonstrate that the challenged provision treats persons who are similarly situated differently and, in doing

so, impinges on a fundamental right or affects a suspect class of individuals. *State* v. *Wright*, 246 Conn. 132, 139–40, 716 A.2d 870 (1998). If the provision does not interfere with a fundamental right or affect a suspect class of persons, it will survive a constitutional attack as long as the distinction is rationally related to some legitimate government interest. Id.

In the present case, the defendant contends that § 4-5 (b) of the Connecticut Code of Evidence interferes with the presumption of innocence and the fundamental right to a fair trial and should be subject to strict scrutiny review. As the state points out in its brief, however, "[e]very single case that the state has found that has addressed an equal protection claim in this context has rejected it." In *United States* v. *Enjady*, 134 F.3d 1427, 1433–34 (10th Cir.), cert. denied, 525 U.S. 887, 119 S. Ct. 202, 142 L. Ed. 2d 165 (1998), for example, the United States Court of Appeals for the Tenth Circuit rejected an equal protection challenge to rule 413 of the Federal Rules of Evidence, which permits the admission of evidence of uncharged misconduct in sexual assault cases. See also Fed. R. Evid. 414 (permitting uncharged misconduct evidence in child molestation cases). After determining that rule 413 of the Federal Rules of Evidence did not burden a fundamental right or target a suspect class, the court applied rational basis review and concluded that Congress' goal of enhancing effective prosecution for sexual assaults is a legitimate interest and therefore a rational basis supporting the rule. *United States* v. *Enjady*, supra, 1433–34.

The United States Court of Appeals for the Ninth Circuit arrived at the same conclusion after considering an equal protection challenge to rule 414 of the Federal Rules of Evidence. See *United States* v. *LeMay*, 260 F.3d 1018, 1030–31 (9th Cir. 2001), cert. denied, 534 U.S. 1166, 122 S. Ct. 1181, 152 L. Ed. 2d 124 (2002). In *LeMay*, the court emphasized that there is "no fundamental right to have a trial free from relevant propensity evidence that is not unduly prejudicial. Although the right to a fair trial may in some instances preclude the introduction of highly inflammatory evidence completely out of proportion to its probative value . . . [r]ule 403 [of the Federal Rules of Evidence] ensures that evidence which is so prejudicial as to jeopardize a defendant's right to a fair trial will be excluded. Thus, the claim that [r]ule 414 [of the Federal Rules of Evidence] unfairly impinges on sex offenders' fundamental right to a fair trial also fails." (Citation omitted.) Id.; see also *United States* v. *Stokes*, 726 F.3d 880, 896 (7th Cir. 2013); *United States* v. *Julian*, 427 F.3d 471, 487 (7th Cir. 2005), cert. denied, 546 U.S. 1220, 126 S. Ct. 1444, 164 L. Ed. 2d 143 (2006); *United States* v. *Mound*, 149 F.3d 799, 801 (8th Cir. 1998), cert. denied, 525 U.S. 1089, 119 S. Ct. 842, 142 L. Ed. 2d 697 (1999); *United States* v. *Castillo*, 140 F.3d 874, 883 (10th Cir. 1998).

The defendant fails to address *Enjady*, *LeMay* or any of the additional cases that have rejected equal protection challenges in this context. Furthermore, he provides no alternative analysis or applicable authority to support his claim. The single case the defendant relies on, *United States* v. *McCallum*, 584 F.3d 471, 476 (2d Cir. 2009), does not involve an equal protection challenge and merely emphasizes that a court, in determining whether to admit misconduct evidence, must carefully balance the probative value of the evidence against its prejudicial effect. We find no merit to the defendant's equal protection claim and therefore reject it.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The defendant appealed to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] Section 4-5 (b) of the Connecticut Code of Evidence, as amended in 2011 and effective January 1, 2012, provides: "Evidence of other sexual misconduct is admissible in a criminal case to establish that the defendant had a tendency or a propensity to engage in aberrant and compulsive sexual misconduct if: (1) the case involves aberrant and compulsive sexual misconduct; (2) the trial court finds that the evidence is relevant to a charged offense in that the other sexual misconduct is not too remote in time, was allegedly committed upon a person similar to the alleged victim, and was otherwise similar in nature and circumstances to the aberrant and compulsive sexual misconduct at issue in the case; and (3) the trial court finds that the probative value of the evidence outweighs its prejudicial effect." See Conn. Code Evid. (Rev. to 2012) § 4-5 (b), available at http//jud.ct.gov/Publications/code2000.pdf.

As indicated, § 4-5 of the Connecticut Code of Evidence was amended in 2011. All subsequent references herein to § 4-5 are to the 2012 revision.

[3] Pursuant to § 4-5 (c) of the Connecticut Code of Evidence; see footnote 2 of this opinion; evidence of other misconduct is admissible to prove intent, motive and absence of mistake or accident, provided that the probative value of the evidence is not outweighed by its prejudicial value. See *State* v. *Baldwin*, 224 Conn. 347, 355, 618 A.2d 513 (1993) (testimony that defendant previously sold narcotics relevant to show defendant's intent in charged incident); *State* v. *James*, 211 Conn. 555, 578, 560 A.2d 426 (1989) (testimony that defendant made sexual advances to victim several months before charged incident was admissible to show defendant had particular interest in victim and motive to commit crime charged); *State* v. *Tucker*, 181 Conn. 406, 415–16, 435 A.2d 986 (1980) (testimony that defendant engaged in acts that hurt child prior to incident resulting in child's death was admissible because relevant to show death resulted from intentional rather than accidental act).

[4] Because the defendant has not provided an independent analysis of his state constitutional claim under *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we consider that claim abandoned and unreviewable. See *State* v. *Santos*, 318 Conn. 412, 414 n.1, 121 A.3d 697 (2015).