******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MARCELO CERVANTES
(AC 37649)

Sheldon, Mullins and Flynn, Js.

*Argued January 3—officially released April 4, 2017*

(Appeal from Superior Court, judicial district of New Haven, Vitale, J. [motion to suppress]; Clifford, J. [judgment].)

*Manuel A. Suarez*, assigned counsel, for the appellant (defendant).

*Matthew R. Kalthoff*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, former state's attorney, and *John P. Doyle, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. Following a conditional plea of nolo contendere, entered pursuant to General Statutes § 54-94a,[1] the defendant, Marcelo Cervantes, appeals from the judgment of conviction of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1) and home invasion in violation of General Statutes § 53a-100aa (a) (1). The defendant entered his conditional plea following the court's denial of his motion to suppress certain oral statements that he made to members of the Hamden Police Department. He made the statements during, what he claims to have been, a custodial interrogation inside of a police vehicle, without the benefit of having been advised of his constitutional rights under *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The state argued, and the trial court agreed, that the challenged statements should not be suppressed because, although the defendant, concededly, was interrogated in the vehicle by the police before he made such statements, he was not in custody at that time for purposes of *Miranda*. On appeal, the defendant claims that the court erred in denying his motion to suppress. We affirm the judgment of the trial court.

On August 12, 2014, before the defendant entered a conditional plea of nolo contendere, the state recited the following facts. On April 14, 2013, the Hamden Police Department received a 911 call reporting that a twenty-two year old female had been sexually assaulted. The caller, the victim in this case, stated that, at approximately, 2 a.m., she had awoken to find an unknown Hispanic male lying on top of her in her bed. The assailant removed her clothing, forced her to engage in penile-vaginal intercourse, oral intercourse, and attempted anal intercourse. Although the victim attempted to fight off the assailant, her resistance was met with strangulation, suffocation, and a punch to the face. The assault continued until approximately 4:15 a.m. At that time, the assailant left the premises after placing a sheet over the victim's head and telling her that if she told anyone of the assault, he would kill her. The victim sustained injuries to her neck and her face.

Subsequently, the police developed the defendant as a suspect and went to speak with him at his place of employment. After some initial conversation, the defendant was transported to the Hamden Police Department. During the police interview prior to arriving at the police department, the defendant admitted to some of the conduct that occurred at the victim's residence, although he described the encounter differently than did the victim.

The police informed the defendant of his constitutional rights in accordance with *Miranda* after they arrived at the police department, and the defendant

signed a waiver of rights form. He then gave further statements about what had occurred on the night of April 14, 2013. Thereafter, the police arrested the defendant.

In a long form information, the state charged the defendant with two counts of sexual assault in the first degree, and one count of attempt to commit sexual assault in the first degree, home invasion, burglary in the first degree in violation of General Statutes § 53a-101 (a) (1), and strangulation in the second degree in violation of General Statutes § 53a-64bb (a).

On May 31, 2013, the defendant filed a motion to suppress the oral statements he had made to detectives while in the police vehicle. That motion was heard on April 9 and 17, 2014. In a June 10, 2014 memorandum of decision, the court denied the defendant's motion. Subsequently, on August 12, 2014, the defendant entered a conditional plea of nolo contendere, and, per § 54-94a, the court made a finding that the denial of the suppression motion was dispositive of the case.[2] This appeal followed.

The defendant claims that the trial court improperly denied his motion to suppress statements he made to the police while in the police vehicle. He argues that he was in police custody the moment he entered the police vehicle and that the statements he made during this custodial interrogation should have been suppressed because the detectives failed to provide him with *Miranda* warnings. The state concedes that the defendant was interrogated by two detectives from the Hamden Police Department while in the police vehicle, but it argues that the defendant was not in custody for purposes of *Miranda* because he voluntarily spoke with the detectives, voluntarily entered the police vehicle, and voluntarily accompanied the detectives to the police station. We agree with the state.

Following the hearing on the motion to suppress, the court, in its memorandum of decision, set forth the following findings of fact, which are relevant to our analysis. "Detective Brian Stewart and Detective William C. Onofrio of the Hamden Police Department were assigned to investigate an alleged home invasion and sexual assault that had occurred on April 14, 2013 . . . in Hamden. During the course of the investigation, police received descriptive information about the perpetrator's height, weight, and ethnicity. The alleged perpetrator was described as a five feet, six, to five feet, seven inches tall Hispanic male, with some sort of protruding belly or stomach. . . . On or about May 16, 2013, Detective Onofrio received information related to the case from Robert Carrasco. Carrasco left a voice mail [message] on Onofrio's phone. The information from Carrasco was that an individual named Marcelino had been observed making sexual advances to an intoxicated female on the night of April 14, 2013, at a bar in

Hamden, named Andales. Carrasco believed Marcelino to be a former employee of his business.[3] Andales was located in close proximately to [the victim's residence]. Onofrio was the lead detective assigned to investigate the case. . . . [On the basis of this and other] information received from Carrasco, Onofrio decided to travel to the Outback Steak House [Outback] located in Southington in an effort to determine the identity of . . . Marcelino. . . .

"The detectives traveled from Hamden to Southington in an unmarked police vehicle. It had no lights affixed to the roof, nor any markings describing it as a police vehicle. . . . Onofrio operated the vehicle, and, when he arrived at Outback, he traveled through the parking lot and parked in the rear. The vehicle was not parked in a designated space. They arrived at approximately 5 p.m. Outback . . . [is] located in a plaza with other businesses nearby, although [it] ha[s] its own parking lot. . . . The police vehicle was parked approximately twenty-five feet away from some other vehicles parked in the lot. . . . A back door, used by the managers, would allow access to the rear of [Outback] and [the] parking lot, and [it] was located near [a] dumpster. Six or seven [Outback] employees worked in the area immediately adjacent to the back door. The back door had a window, and an employee could look out of the window if standing in front of the door. . . .

"Onofrio and Stewart exited the vehicle and walked to the front doors of [Outback]. . . . Each wore plain clothes . . . . Either Onofrio or Stewart asked the hostess if the manager was available. Stewart observed an individual standing near the hostess who generally satisfied the description of the alleged perpetrator. Onofrio and Stewart stepped outside of [Outback] to await the manager. Eventually, manager Ryan Lucas came outside to meet them. They identified themselves as members of the Hamden Police Department. The detectives explained that they were interested in speaking with an individual named Marcelino. Lucas stated that he did not have an employee named Marcelino. Lucas next provided the detectives with the restaurant's employee roster, which did not contain the name Marcelino. Given his earlier observation, Stewart asked Lucas the identity of the Hispanic male that had been standing near the hostess. When told by Lucas that the individual's name was Marcelo, the detectives asked Lucas to inquire if Marcelo would be willing to speak with them.

"Lucas left Onofrio and Stewart outside and returned to the [Outback]. Shortly thereafter, Lucas proceeded through the front doors with [the defendant]. . . . The detectives asked the defendant for permission to speak with him. The defendant agreed to speak with the detectives, and Lucas returned to the [Outback]. . . . Onofrio, Stewart and the defendant began walking along

the side of the building toward the rear of the building. Either Onofrio or Stewart told the defendant that they were investigating a crime but, at that point, did not provide the defendant with details. The defendant conversed with the detectives in English and indicated no difficulty with English comprehension. The defendant then was asked by detectives if he would be willing to speak to them in the police vehicle for privacy. The defendant agreed and was very cooperative. . . . The parking lot was busy, and [the] detectives did not want to discuss sexual assault allegations in a public parking lot.[4]

"The defendant sat in the front seat of the vehicle. He was not physically placed into the vehicle by either detective. He was not directed to the vehicle by either detective pointing to it, nor was he physically led to the vehicle. The defendant used his own volitional movements to sit down in the front seat of the vehicle. He was not handcuffed. There is no evidence that any of the doors of the vehicle were locked. Onofrio then sat in the operator's seat, and Stewart [sat] in the backseat. Although their service weapons were visible, neither detective handled, touched, or unholstered their weapon. Neither detective wore a bulletproof vest, or carried a baton, or spray canister. The vehicle did not contain a cage separating the front and back seats. . . .

"Onofrio, at that point, further explained to the defendant that they were investigating a rape allegation and that a female had made a complaint that the police were pursuing. The defendant was asked if he had any information regarding the complaint. The defendant then described a consensual sexual encounter. Although he was nervous, the defendant was very cooperative and wanted to clear up the matter. He denied any wrongdoing. The detectives allowed him to tell his story and asked questions in an effort to clarify his account. The defendant remained in the vehicle, speaking with the detectives in the public parking lot for approximately fifteen to twenty minutes. The detectives never expressly told the defendant at any point during any of their interactions that he did not have to speak with them and could leave or stop talking at any time. . . .

"[T]he defendant was now a suspect. Although he had the ability to leave, the defendant was asked if he would be willing to speak to police further at the Hamden Police Department. The defendant was not told that he had to go to the police department. The defendant agreed to travel to the Hamden Police Department to continue the interview. Onofrio called the sergeant on duty to notify him that the defendant had agreed to be interviewed at the police department. The defendant was given the opportunity to drive his own vehicle to the police department. The defendant declined, indicating that, although he had a car, he did not have a driver's

license.[5] The defendant could see his own vehicle from the police vehicle. The detectives did not inform Lucas that the defendant was leaving the premises with them, nor did the defendant ask to speak to Lucas before leaving . . . with police. The defendant left some property at [Outback], including his vehicle. The defendant did not tell the police about the property, or ask to retrieve it, nor did [the] police ask him about his need to retrieve any property.

"While driving from Southington to Hamden, the defendant became emotional. He feared that his girlfriend and family would find out that he had engaged in a consensual sexual encounter with another woman. Most of the conversation in the car en route to Hamden concerned his girlfriend and his family. Once in Hamden, Onofrio drove the vehicle [by the victim's residence], whereupon the defendant identified the house . . . .

"The defendant then was brought to the Hamden Police Department, where he was brought inside through the employee entrance. He was not handcuffed, nor pulled or pushed into the building or interview room. He eventually was provided with *Miranda* warnings at approximately 6:29 p.m. State's exhibit 1, a CD of the interview of the defendant at the police department, does not demonstrate any difficulty on the part of the defendant to either speak or understand English. The defendant acknowledged during the interview that he had accompanied Onofrio and Stewart to the police department to further discuss the incident." (Footnotes added; internal quotation marks omitted.)

After finding those facts, the court concluded that the defendant was not in custody during his interrogation because he voluntarily spoke with the detectives, voluntarily accompanied them to the police vehicle, and voluntarily accompanied them to the Hamden Police Department. The court, thereafter, denied the defendant's motion to suppress the statements he made to Onofrio and Stewart while in the police vehicle.

The defendant argues that he was in custody as soon as he entered the police vehicle, and that he underwent a custodial interrogation for ninety minutes thereafter. The state, although acknowledging that the detectives conducted an interrogation while in the vehicle, contends that the trial court properly concluded that the defendant, at all relevant times, was in the police vehicle voluntarily and was not in custody. We agree with the state.[6]

We first set forth the principles that guide our analysis. "In order to establish that he was entitled to *Miranda* warnings, a defendant must show that he was in custody when he made the statements and that he made the statements in response to police questioning." *State* v. *Arias*, 322 Conn. 170, 177, 140 A.3d 200 (2016).

"As used in . . . *Miranda* [and its progeny], custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. . . . In determining whether a person is in custody in this sense . . . the United States Supreme Court has adopted an objective, reasonable person test . . . the initial step [of which] is to ascertain whether, in light of the objective circumstances of the interrogation . . . a reasonable person [would] have felt [that] he or she was not at liberty to terminate the interrogation and [to] leave. . . . Determining whether an individual's freedom of movement [has been] curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. [Accordingly, the United States Supreme Court has] decline[d] to accord talismanic power to the freedom-of-movement inquiry . . . and [has] instead asked the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. . . .

"Of course, the clearest example of custody for purposes of *Miranda* occurs when a suspect has been formally arrested. As *Miranda* makes clear, however, custodial interrogation includes questioning initiated by law enforcement officers after a suspect has been arrested or otherwise deprived of his freedom of action in any significant way. . . . Thus, not all restrictions on a suspect's freedom of action rise to the level of custody for *Miranda* purposes . . . ." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Mangual*, 311 Conn. 182, 193–94, 85 A.3d 627 (2014).

"In assessing whether a person is in custody for purposes of *Miranda*, the ultimate inquiry is whether a reasonable person in the defendant's position would believe that there was a restraint on [his] freedom of movement of the degree associated with a formal arrest. . . . Any lesser restriction on a person's freedom of action is not significant enough to implicate the core fifth amendment concerns that *Miranda* sought to address." (Internal quotation marks omitted.) *State* v. *Arias*, supra, 322 Conn. 177.

In *Mangual*, our Supreme Court set forth several "nonexclusive . . . factors to be considered in determining whether a suspect was in custody for purposes of *Miranda*: (1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or

used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public." *State* v. *Mangual*, supra, 311 Conn. 196–97.

We next set forth the standard of review we employ when assessing the trial court's denial of a motion to suppress on the basis of the defendant's failure to establish that he was in custody during an interrogation. "The trial court's determination of the historical circumstances surrounding the defendant's interrogation [entails] findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . In order to determine the [factual] issue of custody, however, we will conduct a scrupulous examination of the record . . . in order to ascertain whether, in light of the totality of the circumstances, the trial court's finding is supported by substantial evidence. . . .

"The ultimate inquiry as to whether, in light of these factual circumstances, a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest . . . calls for application of the controlling legal standard to the historical facts [and] . . . therefore, presents a . . . question of law . . . over which our review is de novo. . . . In other words, we are bound to accept the factual findings of the trial court unless they are clearly erroneous, but we exercise plenary review over the ultimate issue of custody." (Citation omitted; internal quotation marks omitted.) Id., 197.

With these principles in mind, we turn to the merits of the defendant's claim that his statements should have been suppressed because he was in custody the moment he entered the police vehicle, and that Onofrio and Stewart then conducted an interrogation of him without providing *Miranda* warnings. After applying the *Mangual* factors to the present case, we conclude that the trial court properly determined that the defendant was not in custody when he made oral statements to the detectives while being interrogated in the police vehicle.[7]

The record demonstrates that Onofrio and Stewart asked Lucas to go back into Outback and ask the defendant if he was willing to talk with them. The defendant then came out, voluntarily, to speak with Onofrio and Stewart. The detectives spoke with the defendant for three to five minutes before asking him if he would be willing to sit in the police vehicle for privacy. He agreed and was very cooperative with the detectives. The vehicle was located in the rear parking area of Outback, and there was a window from which employees could see that parking lot. Within a short period of time of being inside the vehicle, the defendant made several oral statements to the detectives, which he later sought to suppress.

The defendant told the detectives that he was familiar with the victim's residence, having done work at that location for the property owner. He also told the detectives that he had met a woman in a bar who agreed to have sexual relations with him at her home, which was located at the victim's address. He further stated that he then parked his vehicle at a gas station not far from that residence. Finally, he stated that he had gone to the victim's home where he engaged in sexual relations with a woman, although he contended those relations were consensual.

After being in the parked vehicle for approximately twenty minutes, the detectives asked the defendant if he would accompany them to the Hamden Police Department, and the defendant agreed. The detectives asked the defendant if he wanted to drive himself, but the defendant declined because he did not have a valid driver's license, although his car was parked at Outback.

During the drive to the police department, the defendant primarily discussed his girlfriend and his family. He told the detectives that he was concerned that his girlfriend would find out that he had engaged in sexual relations with another woman. He also cried. While driving to the police station, the detectives also drove past the victim's residence, and the defendant identified the house. Although the defendant claims that the drive by the victim's house further demonstrates that he was in custody, there is nothing in the record that would indicate that this somehow transformed a noncustodial interrogation into a custodial interrogation. Indeed, at that point, the defendant already had admitted that he was familiar with the property and that he had engaged in sexual relations with a woman at that location on the night of April 13, 2013.

Looking at the circumstances presented here, nothing in the record suggests that, when the defendant made his incriminating statements to the detectives, there was any restraint on his freedom of movement to the degree associated with a formal arrest. The record shows that only two plainclothed detectives, Onofrio and Stewart, went to speak with the defendant at his job. When the detectives arrived, they first asked the manager to ask the defendant if he would be willing to speak with them. The detectives did not compel the defendant to speak with them, but, rather, he agreed and voluntarily spoke with the detectives outside of Outback, in a public place with which he was familiar. Indeed, the defendant stated that he wanted to "clear up the matter." There is no indication that Onofrio and Stewart presented a show of force somehow orchestrated to overpower the defendant's will to resist the interview and compel him to speak. In other words, this was not a police dominated atmosphere that contained inherently compelling pressures upon the defendant.

As the detectives conversed with the defendant outside, they asked him whether he would be willing to continue their conversation in their vehicle. The defendant was neither ordered nor forced into the vehicle. Rather, he voluntarily agreed to move the somewhat personal conversation from an outdoor area into the police vehicle. At no point was the defendant handcuffed, and the detectives did not isolate him from the public. Although both detectives wore their service revolvers, those revolvers properly were holstered, the detectives never intimated that those weapons might be used, and they did not use any other kind of force or threat of force before or during their questioning. Finally, after the defendant agreed to go to the police station, the detectives gave the defendant the option of driving himself rather than riding with them in the police vehicle. The defendant rejected the detectives' offer for him to leave their vehicle and drive himself, and, instead, he agreed to have the detectives drive him to the police station to continue their discussion.[8] We are convinced, on the basis of this record, that the defendant's discussions with the detectives were voluntary and that he was not in custody.

After considering all of the circumstances surrounding the defendant's questioning, we cannot conclude that a reasonable person in the defendant's position would have believed that his freedom of movement was restrained to the degree associated with a formal arrest. See *State* v. *Arias*, supra, 322 Conn. 177. As such, we conclude that the defendant was not in custody when he made his oral statements to the detectives, and, therefore, the detectives were not required to provide him with an advisement of his rights under *Miranda* at that time. Accordingly, the trial court properly denied his motion to suppress.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

[2] In its appellate brief, the state raises an alternative argument that, if we agree with the defendant that he was in custody for purposes of *Miranda* and that the motion to suppress should have been granted, we should remand the matter for further proceedings, including the possibility of a trial on the charged crimes. The defendant in his main brief also contended that his "conditional plea of nolo contendere and subsequent conviction should be vacated and the case should be remanded for a new trial with all inculpatory statements made by the defendant suppressed." The proposition that we should remand this case for a potential trial, if we determined that the motion to suppress should have been granted, caused us initially to question whether this case properly was before this court in light of the mandatory

finding, necessary before a conditional plea would give the defendant a right to appeal, that the motion to suppress *is dispositive of the case*.

The record in this case demonstrates that the trial court specifically told the defendant, when accepting his conditional plea, that, after sentencing, he had the right to appeal the denial of the underlying motion to suppress. The court, however, then told the defendant that "if [he did] not prevail in that appeal . . . the sentence . . . would remain in effect . . . [but that if he were successful on appeal] then that sentence would be vacated, and [the case] would be back in [the trial court] for purposes of potential trial if the case could still go forward." The defendant then told the court that he understood.

Later in the proceeding, after making the specific finding that the motion to suppress was dispositive of the case, the court explained: "I do know that after his arrest there may be some connection through DNA that was done afterward, but I still feel that if . . . he was in custody and the motion [to suppress] should have been granted, they may very well not have gotten to the DNA issue, not meaning that if it is reversed that the state could not still attempt to prosecute him. But I am making the determination that the ruling on that motion to suppress is dispositive of the case . . . ."

During oral argument, we asked counsel to address this matter. The state argued that if we agreed with the defendant that the motion to suppress should have been granted, we should remand the case for further proceedings, including the possibility of trial on the underlying crimes. The state contended that this was the proper course of action because this was the information conveyed to the defendant at the time the court accepted his conditional plea, and there remains a possibility that other evidence could be used to attempt to establish the defendant's guilt. The state further argued that the term "dispositive of the case" could be read to mean that, in light of trial court's denial of the motion to suppress, the defendant virtually had no chance of prevailing at trial, and, therefore, as far as the defense was concerned, the denial of this motion was dispositive.

The defendant's counsel, however, argued that, if we agree with the defendant that the motion to suppress should have been granted, the state should not be permitted to continue to trial on the underlying crimes because the court made a finding that the denial of the motion to suppress was dispositive *of the case*. He contended that the term "dispositive of the case" meant that this evidence was necessary to the state's case, and it could not proceed to trial without it.

We conclude that resolution of the issue of whether "*dispositive of the case*" means that the defendant virtually had no chance of prevailing at trial, as the state suggests, or that the evidence that is the subject of the motion to suppress is so essential to the state's case that the state could not proceed without it, as the defendant suggests, is not necessary to the outcome of this appeal. Therefore, we do not attempt to resolve it in this opinion, but save the matter for another, more appropriate, case.

We come to this conclusion, first, because whether the denial of the motion to suppress is dispositive of the case does not implicate the subject matter jurisdiction of this court. See *State* v. *Joseph*, 161 Conn. App. 850, 857, 129 A.3d 183 (2015), cert. denied, 320 Conn. 923, 133 A.3d 878 (2016); *State* v. *McGinnis*, 83 Conn. App. 700, 704 n.6, 851 A.2d 349 (2004). Indeed, this court has jurisdiction over a criminal appeal from a final judgment. Here, the sentence imposed on the defendant constitutes a final judgment. So, the case is properly before this court.

Second, notwithstanding the trial court's ruling on this issue, namely, that the motion to suppress *was dispositive of the case*—but, if the defendant were to succeed on appeal, he still might face trial on the basis of other evidence—because we conclude that the motion to suppress properly was granted, we need not determine the import, if any, of this alternative argument raised by the state. Thus, as our legislature has provided by virtue of the clear language of § 54-94a, the issue to be decided on appeal from an accepted conditional plea of nolo contendere, where the court has made a finding that the denial of the motion to suppress was dispositive of the case, "*shall be limited to whether it was proper for the court to have denied the motion to suppress . . . .*" (Emphasis added.) General Statutes § 54-94a. Because that finding was made by the trial court, we limit our review in accordance with the statute.

[3] During the hearing on the motion to suppress, the defendant admitted that he previously did some work for Carrasco on property that Carrasco owned, which included the victim's residence.

[4] During the hearing on the motion to suppress, the defendant admitted

that, while he was standing *outside* the police vehicle talking with the detectives, he told them that he had gone to Andale's bar on the night of April 13, 2013, and that he had met a woman there who invited him back to her residence. He also admitted that he told the detectives that he then went and parked his vehicle at a gas station and walked to the home of the woman on [the victim's] street. The questioning involving the encounter was then moved to the inside of the police vehicle. The record also demonstrates that the victim was not at Andale's bar on the night of April 13, 2013.

[5] During cross-examination at the hearing on the motion to suppress, the defendant also admitted that his vehicle, a Chevy Cobalt, was not registered or insured.

[6] We also note that during the hearing on the motion to suppress, the defendant admitted that he made inculpatory statements prior to getting into the police vehicle. See footnote 4 of this opinion. It is unclear whether the trial court credited that admission, however.

[7] The defendant also argues that the court made a clearly erroneous factual finding in its memorandum of decision when it stated that "[although] the police did not notify [the defendant's employer] of the defendant's departure, or ask the defendant about his need to do so, or need to retrieve personal property, there is no evidence that the defendant made either request or that, if requested, the police would have refused." (Emphasis omitted.) He argues that this finding is clearly erroneous because there was evidence in the form of the defendant's own testimony that he inquired about the need to retrieve his personal belongings but that the detectives said it was not necessary. We conclude that it reasonably is likely that the court meant that there was no credible evidence, rather than no evidence.

Although the defendant, in fact, did testify that he asked to retrieve his belongings and the detectives told him that it was not necessary, Stewart testified that the defendant did not tell them that he had belongings that he wanted to retrieve. It seems readily apparent that the court credited the testimony of Stewart.

[8] We note that the officers did not tell the defendant he was free to leave. A finding of custody, however, does not turn solely on this determination. See *State* v. *Mangual*, supra, 311 Conn. 204 and n.16 (although specifically informing suspect that he is "free to leave" may be effective means of demonstrating that suspect is not in custody, this specific statement is not necessarily determinative of custody issue).