******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ANDREW HULL ET AL. *v.* TOWN OF NEWTOWN
(SC 19656)

Rogers, C. J., and Palmer, Eveleigh, McDonald,
Robinson, Vertefeuille and Espinosa, Js.*

*Syllabus*

The plaintiffs, A and his wife, sought to recover damages for personal injuries
that A sustained when he was shot by L, a patient at the hospital where
A was employed as a nurse. An officer with the Newtown Police Depart-
ment had arranged for L to be transported to the hospital after L
approached the officer and complained that he was experiencing audi-
tory hallucinations and shortness of breath. Without searching L, the
officer took him into involuntary custody and arranged for him to be
transported to the hospital pursuant to a civil mental health commitment
statute (§ 17a-503 [a]). The plaintiffs alleged that the officer had a minis-
terial, nondiscretionary duty to search L pursuant to the police depart-
ment's arrest policy, which provided that officers must conduct a search
of any person arrested, and defined "arrest" as the taking of a person
into custody. The defendant, the town of Newtown, moved for summary
judgment, claiming, inter alia, that it was immune from liability pursuant
to statute (§ 52-557n) because any duty to search L was discretionary,
and, because L was not in custody pursuant to the arrest policy, there
was no duty to search him. The trial court denied the town's motion.
Thereafter, in response to the plaintiffs' motion for a ruling as to whether
"custody" under § 17a-503 (a) equated to arrest under the arrest policy,
the trial court concluded that taking a person into custody pursuant to
§ 17a-503 (a) was not an arrest and that L was not arrested under the
arrest policy. The town filed a second motion for summary judgment,
contending that the police had no duty to search L because he had not
been arrested under the arrest policy or under § 17a-503 (a). The plain-
tiffs then moved to amend their complaint to include the alternative
theory that the police had a duty to search L pursuant to the police
department's prisoner transportation policy, which provided that, prior
to transport, all prisoners were required to be searched for any weapons
or contraband. The trial court denied the plaintiffs' motion to amend,
granted the town's second motion for summary judgment, and rendered
judgment for the town, from which the plaintiffs appealed. *Held*:
1. This court concluded that, because the police department's arrest policy
applies solely in the criminal context and because the term "custody"
in § 17a-503 (a), the statute pursuant to which L was taken into custody,
did not denote criminal custody or arrest but, rather, custody to facilitate
an emergency evaluation of a person for whom the police have reason-
able cause to believe has psychiatric disabilities and is a danger to
himself or others, or is gravely disabled and in need of immediate care
and treatment, L was not taken into custody under the arrest policy,
and, thus, L was not subject to the search requirement in that policy;
accordingly, the arrest policy did not impose a ministerial, nondiscretion-
ary duty on the police to search L when they took him into custody
pursuant to § 17a-503 (a).
2. The plaintiffs could not prevail on their claim that L was a prisoner under
the police department's prison transportation policy and, therefore, that
the police had a ministerial, nondiscretionary duty to search him under
that policy when he was taken into custody pursuant to § 17a-503 (a):
the text of the transportation policy having indicated that its purview
was criminal and did not implicate mental health custody, L was not in
custody or arrested within the meaning of that policy and it was therefore
inapplicable; accordingly, the trial court properly granted the town's
motion for summary judgment.
(*One justice dissenting*)

Argued September 12—officially released December 26, 2017

*Procedural History*

Action to recover damages for personal injuries sus-

tained by the named plaintiff as a result of the alleged negligence of the defendant's employees, brought to the Superior Court in the judicial district of Danbury, where the court, *Ozalis, J.*, granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiffs appealed. *Affirmed.*

*David N. Rosen*, for the appellants (plaintiffs).

*Aaron S. Bayer*, with whom was *Tadhg Dooley*, for the appellee (defendant).

*Kathleen M. Flaherty* and *Kirk W. Lowry* filed a brief for the Connecticut Legal Rights Project et al. as amici curiae.

*Opinion*

ESPINOSA, J. This appeal requires us to determine whether certain policy and procedures of the Newtown Police Department (department) imposed a ministerial duty on its officers to search Stanley Lupienski, an individual suffering from auditory hallucinations and shortness of breath, when they took him into custody pursuant to General Statutes § 17a-503 (a).[1] The plaintiffs, Andrew Hull and Erica Hull,[2] appeal[3] from the judgment of the trial court granting summary judgment in favor of the defendant, the town of Newtown. The plaintiffs contend that the arrest section of the department's policy (arrest policy) imposes a ministerial, non-discretionary duty on the police to search anyone taken into custody, including those taken into custody pursuant to § 17a-503 (a). See Newtown Board of Police Commissioners, Newtown Police Policy and Procedure 3.00 (revised February 1, 2005) (Police Policy). Alternatively, the plaintiffs argue that Lupienski was a prisoner and, therefore, subject to mandatory search under the department's prisoner transportation section of the policy (transportation policy). See id., 3.07 (revised May 5, 2009). The defendant counters that the arrest policy applies only in the context of criminal arrest and does not apply in the context of civil mental health custody, which is governed by § 17a-503 (a). The defendant also argues that the transportation policy does not apply to those under custody pursuant to § 17a-503 (a). We agree with the defendant and, therefore, affirm the judgment of the trial court.

The following undisputed facts are relevant to this appeal. The plaintiffs' claims arise from an incident at Danbury Hospital on March 2, 2010. While a patient at the hospital, Lupienski shot Andrew Hull, an assistant nurse manager. Lupienski had been transported to the hospital approximately thirty-eight hours earlier, after he went to the department complaining of auditory hallucinations and shortness of breath. Without searching Lupienski, Officer Steven Borges took him into involuntary custody and arranged for him to be transported to the hospital by Newtown Emergency Management Services, as provided by § 17a-503 (a).

The plaintiffs subsequently brought this action, seeking damages for, inter alia, the injuries sustained by Andrew Hull, and alleging that the police had a ministerial, nondiscretionary duty to search Lupienski pursuant to the arrest policy. The defendant moved for summary judgment, arguing that (1) it was immune from liability because any duty to search was discretionary rather than ministerial, (2) any requirement to search would have been a public duty resulting in a public injury rather than an individual injury, (3) there was no custody pursuant to the arrest policy and therefore no duty to search Lupienski, and (4) the plaintiffs had submitted no proof that a search would have

revealed a weapon. The trial court denied the motion. The plaintiffs subsequently filed a motion seeking a legal ruling from the trial court as to whether "custody" under § 17a-503 (a) equates to "arrest" under the arrest policy. In its memorandum of decision, the court concluded that "as a matter of law . . . taking a person into custody pursuant to § 17a-503 (a) is not an 'arrest' and that Lupienski was not 'arrested' under the [Police Policy]." As a result of the trial court's decision, the defendant filed a second motion for summary judgment, contending that the police had no duty to search Lupienski because he was not arrested under the arrest policy or under § 17a-503 (a). Several weeks later, the plaintiffs moved to amend the complaint to include their alternative theory that alleged that the police had a duty to search Lupienski pursuant to the transportation policy. The trial court denied the plaintiffs' motion to amend and granted the defendant's motion for summary judgment. The court also denied the plaintiffs' subsequent motion for reconsideration, which argued that the trial court improperly declined to consider the transportation policy as an alternative legal basis for the duty to search. This appeal followed.

The plaintiffs' primary argument implicates governmental immunity. Their theory of liability is that the police had a ministerial or mandatory, nondiscretionary duty to search Lupienski. The plaintiffs rest this conclusion on two premises. First, the plaintiffs contend that the arrest policy requires officers to search arrestees, and that individuals, like Lupienski, who are taken into custody pursuant to § 17a-503 (a), have been "arrested" for the purposes of the arrest policy. Second, the plaintiffs offer as an alternative argument that the transportation policy imposed a ministerial, nondiscretionary duty to search Lupienski. The defendant counters that neither § 17a-503 (a) nor the arrest or transportation policies imposed such a duty and that, as a result, the defendant is shielded from liability due to governmental immunity.

We begin by setting forth the applicable standard of review. "Summary judgment shall be rendered forthwith if the pleadings, affidavits and other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. . . . When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Marchesi* v. *Board of Selectmen*, 309 Conn. 608, 620, 72 A.3d 394 (2013).

With respect to governmental immunity, under General Statutes § 52-557n, a municipality may be liable for

the "negligent act or omission of a municipal officer acting within the scope of his or her employment or official duties." (Internal quotation marks omitted.) *Coley* v. *Hartford*, 312 Conn. 150, 161, 95 A.3d 480 (2014). The determining factor is whether the act or omission was ministerial or discretionary. See id., 161–62 (contrasting extent of municipal liability for ministerial versus discretionary acts). "[Section] 52-557n (a) (2) (B) . . . explicitly shields a municipality from liability for damages to person or property caused by the negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." (Internal quotation marks omitted.) Id., 161. In contrast, "municipal officers are not immune from liability for negligence arising out of their ministerial acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion." (Internal quotation marks omitted.) Id., 162.

Discretionary acts are treated differently from ministerial acts "in part because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the limits desirable in our society. . . . [D]iscretionary act immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officials and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury." (Citation omitted; footnote omitted; internal quotation marks omitted.) Id., 161.

These concerns are particularly appropriate in the present case, in light of the "broad scope of governmental immunity that is traditionally afforded to the actions of municipal police departments." Id., 164. "[I]t is firmly established that the operation of a police department is a governmental function, and that acts or omissions in connection therewith ordinarily do not give rise to liability on the part of the municipality. . . . [Accordingly] [t]he failure to provide, or the inadequacy of, police protection usually does not give rise to a cause of action in tort against a city." (Internal quotation marks omitted.) Id. For example, in *Coley*, we held that governmental immunity shielded the city of Hartford in a wrongful death action stemming from alleged police negligence where two officers failed to stay on the scene of a domestic violence call that later turned fatal. Id., 152, 155–56. The plaintiff in *Coley* claimed that the General Statutes and a Hartford police departmental policy that set forth procedures for police response to domestic violence imposed a nondiscretionary duty to "remain at the scene for a reasonable amount of time until the likelihood of imminent violence had been eliminated . . . ." Id., 152. This court held that "the police officers' allegedly negligent acts . . . required the exercise of

discretion, and, accordingly, the [city of Hartford] [was] immune from liability for its discretionary acts." Id., 172.

In the present case, the police would have been required to search Lupienski only if the arrest policy in conjunction with § 17a-503 (a), or the transportation policy, imposed a ministerial duty to do so. We address each possibility in turn.

I

The plaintiffs' first argument in support of their claim that the police had a ministerial duty operates in three parts: (1) the arrest policy expressly requires officers to search arrestees; (2) the arrest policy defines arrest as taking a person into custody; and (3) custody under the arrest policy encompasses custody as it is used in § 17a-503 (a). As a result, we must examine the meaning of custody in each context, interpreting the arrest policy first and then § 17a-503 (a). Although we agree that the policy requires that arrestees be searched, we conclude that the arrest policy applies solely to the criminal context and therefore does not apply when the police take a person into custody pursuant to § 17a-503 (a).

The department's arrest policy mandates that "[o]fficers shall conduct a thorough search of the person arrested"; Police Policy, supra, 3.00, pt. IV H, p. 4; and defines arrest as "[t]aking a person into custody." Id., pt. III, p. 1. Assuming, without deciding, that the arrest policy imposes a ministerial duty to search those arrested, the question is what the policy means by "custody." Looking to the text of the arrest policy, custody applies in the criminal context alone. Despite the lack of a definition of custody[4] in the arrest policy, our conclusion finds support in that policy's provisions.

First, under the arrest policy, arrest requires either an arrest warrant or probable cause. Id., pt. IV, p. 4. The arrest policy defines probable cause for an arrest as "[t]he existence of facts and circumstances that would lead a reasonably prudent officer to believe that a person had committed a *criminal offense.*" (Emphasis added.) Id., pt. III, p. 1. This requirement of probable cause of a criminal offense corresponds closely with the state and federal understanding of probable cause. See, e.g., *State* v. *Johnson*, 286 Conn. 427, 435–36, 944 A.2d 297 ("In order for a warrantless felony arrest to be valid, it must be supported by probable cause. . . . Probable cause exists when the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that a felony has been committed." [Citations omitted; internal quotation marks omitted.]), cert. denied, 555 U.S. 883, 129 S. Ct. 236, 172 L. Ed. 2d 144 (2008); see also *Devenpeck* v. *Alford*, 543 U.S. 146, 152, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004) ("a warrantless arrest by a law officer is reasonable under the [f]ourth

[a]mendment where there is probable cause to believe that a criminal offense has been or is being committed"). Thus, in the absence of an arrest warrant, the arrest policy allows arrests only where there is probable cause to believe that the arrestee committed a criminal offense. The reverse is also informative; under the arrest policy, any arrest not grounded in probable cause requires an arrest warrant. That option requires an officer to obtain an arrest warrant from a "judge, magistrate, or other legal authority empowered to issue such warrants . . . ." Police Policy, supra, 3.00, pt. IV C, p. 2. Thus, under the arrest policy, there is no arrest unless there is such a warrant, or there is probable cause for a criminal offense.

Second, the arrest policy imposes procedural requirements that further clarify that the policy applies solely to the criminal context. For example, "arresting officers shall identify themselves, inform the suspect of his or her arrest, and *specify the charges for which the arrest is being made.*" (Emphasis added.) Id., pt. IV D, p. 3. This requirement would be irrational and impossible beyond the criminal context. The same is true of the arrest policy mandate that "[a]ll arrested persons shall be handcuffed after being taken into custody, except as otherwise provided by departmental policy . . . ." Id., pt. IV F, p. 3. Relatedly, the arrest policy also directs that "[a]rrestees shall be advised of their *Miranda*[5] rights before any questioning," inherently indicating criminal arrest. (Footnote added.) Id., pt. IV *I*, p. 4. These procedures underpin a scheme that would be absurd and troubling outside of the criminal context.[6]

Having established that custody under the arrest policy applies in the criminal context, it is useful to summarize what the resulting meaning of custody is, as doing so further illustrates the criminal purview of the arrest policy. Custody in this court's criminal law jurisprudence is closely linked to the parameters of custodial interrogation set forth by the United States Supreme Court in *Miranda* v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and its progeny. See, e.g., *State* v. *Arias*, 322 Conn. 170, 177, 140 A.3d 200 (2016) (listing factors for determining existence of custody for purposes of *Miranda*). As a result, the constitutional concerns underpinning custody are related to the danger of coercion in police interrogation, and they are generally discussed in conjunction with *Miranda*. See *State* v. *Mangual*, 311 Conn. 182, 193, 85 A.3d 627 (2014) ("[as] used in . . . *Miranda* [and its progeny], custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion" [internal quotation marks omitted]).

Determining whether custody exists under *Miranda* is circumstance dependent, but "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a

formal arrest. . . . Further, the United States Supreme Court has adopted an objective, reasonable person test for determining whether a defendant is in custody. . . . Thus, in determining whether *Miranda* rights are required, the only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest." (Internal quotation marks omitted.) *State* v. *Jackson*, 304 Conn. 383, 416, 40 A.3d 290 (2012). Nonexclusive factors to consider in determining "whether a suspect was in custody for purposes of *Miranda* [include]: (1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public." (Internal quotation marks omitted.) *State* v. *Arias*, supra, 322 Conn. 177.

Therefore, custody, as it is used in the criminal context and under the arrest policy, is a close relative of formal arrest. Indeed, many of the factors that suggest custody—such as handcuffing—would also suggest a formal arrest. See *State* v. *Mangual*, supra, 311 Conn. 208 ("[h]andcuffs are generally recognized as a hallmark of a formal arrest" [internal quotation marks omitted]). Relatedly, custody often presents itself in the context of police interrogations in criminal investigations, where there is a risk of coercing testimony in violation of *Miranda*.

We next turn to the state statute. Determining whether custody has the same meaning pursuant to § 17a-503 (a) and pursuant to the arrest policy presents a question of statutory interpretation, over which we exercise plenary review, guided by well established principles regarding legislative intent. See, e.g., *Kasica* v. *Columbia*, 309 Conn. 85, 93, 70 A.3d 1 (2013) (explaining plain meaning rule under General Statutes § 1-2z and setting forth process for ascertaining legislative intent). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning . . . § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when

read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *State* v. *Agron*, 323 Conn. 629, 633–34, 148 A.3d 1052 (2016).

Applying these principles as directed by § 1-2z, we begin with the text of § 17a-503 (a). Section 17a-503 (a) provides that "[a]ny police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section. The officer shall execute a written request for emergency examination detailing the circumstances under which the person was taken into custody, and such request shall be left with the facility. The person shall be examined within twenty-four hours and shall not be held for more than seventy-two hours unless committed under section 17a-502."

The text of section § 17a-503 (a) uses the term custody in a manner inconsistent with criminal custody or arrest. In § 17a-503 (a), custody is justified by a reasonable cause belief that a person is suffering from a psychiatric disability and may pose a danger to himself or others, or that a person is "[g]ravely disabled, and in need of immediate care and treatment . . . ." This stands in contrast to the criminal arrest requirement that there be either a warrant or a probable cause belief of a criminal offense. See, e.g., *Devenpeck* v. *Alford*, supra, 543 U.S. 152 ("a warrantless arrest by a law officer is reasonable under the [f]ourth [a]mendment where there is probable cause to believe that a criminal offense has been or is being committed"). Thus, it does not matter whether reasonable cause for custody under § 17a-503 (a) is the same standard as probable cause for arrest, because they are clearly standards for two distinct purposes.

Other language in § 17a-503 (a) illustrates that custody is not used in the criminal context. Specifically, § 17a-503 (a) allows the police to take a psychiatrically or gravely disabled "person into custody and take or cause such person to be taken to a general hospital for *emergency examination* under this section." (Emphasis added.) As a result, the scope of custody is narrow under the statute—its purpose is to facilitate emergency evaluation, not to serve as the initial volley in an interrogation or a criminal investigation. This conclusion comports with this court's previous interpretation of § 17a-503. See *Hopkins* v. *O'Connor*, 282 Conn. 821, 824, 848 n.12, 925 A.2d 1030 (2007) (explaining that officer who took individual into "involuntary custody and caused him to be transported" to hospital for psychiatric evaluation pursuant to § 17a-503 [a] was "serving less in a law enforcement capacity than in a health and safety

capacity").

The other subsections of § 17a-503 further confirm the scope of subsection (a). They outline alternative procedures for obtaining emergency treatment for individuals dangerous to themselves or others due to psychiatric disability, or with a grave disability. For example, pursuant to § 17a-503 (b),[7] probate courts may issue warrants "for the apprehension [of] and bringing before it" a person in need, and may order that such person "be taken to a general hospital for examination."[8] Alternatively, licensed psychologists or licensed clinical social workers can obtain immediate care or treatment for a person in need under § 17a-503 (c)[9] and (d),[10] respectively. Thus, the focus of § 17a-503 is on providing emergency medical care to the psychiatrically or gravely disabled. Police custody under § 17a-503 (a) is just one route by which medical attention may be obtained, and the role of the police under the statute is roughly equivalent to probate courts in § 17a-503 (b), psychologists in § 17a-503 (c), or social workers pursuant to § 17a-503 (d). Thus, custody, as it is employed in § 17a-503 (a), is merely a tool in affording the medical relief embodied in the other provisions of § 17a-503—not a Trojan horse to import criminal procedure jurisprudence into an unrelated statute.

The relationship between § 17a-503 (a) and other statutes further illustrates that its use of the term custody does not denote criminal custody.[11] Section 17a-503 (a) is located in chapter 319i of the General Statutes, which governs "Persons with Psychiatric Disabilities." Specifically, § 17a-503 (a) is in part II of that chapter, which sets forth general provisions for civil commitment. Other statutes in part II cover subjects such as the procedures for commitment hearings, confidentiality in cases involving persons with psychiatric disabilities, and commitment under an emergency certificate. See General Statutes §§ 17a-498, 17a-500 and 17a-502. Section 17a-503, then, is part of a broader legislative scheme focused on psychiatric disability, mental health, and commitment, not criminal procedure.

Although we recognize that there is an aspect of involuntariness to custody under § 17a-503 (a), it is not enough to transform the act of taking into custody into criminal arrest. Section 17a-503 (a) is distinguishable: its aim is psychiatric treatment, rather than criminal justice; it requires reasonable cause to believe a person has a psychiatric or grave disability rather than probable cause for a criminal offense; and it prescribes an entirely different procedure grounded in its mental health purpose. As a result, under § 17a-503 (a), the police are not required to follow the same procedures that they would have been bound by in a criminal arrest.

Thus, the term custody is used differently in § 17a-503 (a) and in the arrest policy. The arrest policy plainly and unambiguously uses the term custody in the context

of criminal arrest. In contrast, § 17a-503 (a) uses the term in the context of providing emergency medical treatment. In the present case, the police did not have a ministerial duty to search Lupienski under the arrest policy. Lupienski was taken into custody pursuant to § 17a-503 (a), but not into "custody" as understood in the arrest policy. Therefore, any duty to search arrestees under the arrest policy was not triggered, and no search of Lupienski was required.

The plaintiffs' other arguments in favor of this theory of liability are not persuasive. The plaintiffs caution that relegating the arrest policy to the criminal context would result in unfettered police discretion and deprive those taken into custody under § 17a-503 (a) of the procedural protections for arrestees under the policy. In the context of § 17a-503 (a), however, the only statute at issue in the present case, police discretion is limited by the narrowly cabined justification and procedures outlined in its text. See *Hopkins* v. *O'Connor*, supra, 282 Conn. 848 n.12 (observing that § 17a-503 [a] contains "other safeguards against any abuse of power by the officer, which are provided by the unique statutory scheme at play in this case—such as immediate psychiatric evaluation"). For example, in addition to the reasonable cause requirement, custody is qualified in § 17a-503 (a) by a requirement that a person be "examined within twenty-four hours and . . . not be held for more than seventy-two hours unless committed under section 17a-502." Should custody evolve beyond these narrow limitations, it very well may give rise to other legal and constitutional protections.

Additionally, it is well established that this court has a duty "to construe statutes, whenever possible, to avoid constitutional infirmities . . . ." *Dernado* v. *Bergamo*, 272 Conn. 500, 506 n.6, 863 A.2d 686 (2005). The plaintiffs' interpretation of § 17a-503 (a) appears to raise constitutional infirmities because it would allow the police to conduct arrests without probable cause or a warrant. See, e.g., *Devenpeck* v. *Alford*, supra, 543 U.S. 152.

The plaintiffs also argue that there are similarities between criminal arrest and custody of the sort envisioned by § 17a-503 (a), because mental health related seizures under New York's civil commitment statute; N.Y. Mental Hyg. Law § 9.41 (McKinney 2011); have been described as arrests by the United States Court of Appeals for the Second Circuit. See *Payne* v. *Jones*, 711 F.3d 85, 88 (2d Cir. 2013) (characterizing that statute as "authoriz[ing] the arrest of a person who appears to be mentally ill and acts in a manner likely to result in serious harm to himself or others"). None of the authorities cited by the plaintiffs provides support for the argument that taking a person into custody pursuant to a civil statute can constitute a criminal arrest.

In support of this claim, the plaintiffs rely on *Disabil-*

*ity Advocates, Inc.* v. *McMahon*, 279 F. Supp. 2d 158, 164 (N.D.N.Y. 2003), aff'd, 124 Fed. Appx. 674 (2d Cir. 2005), which held that "while [N.Y. Mental Hyg. Law §] 9.41 may not use the term 'arrest,' the authority it grants to the police is, in fact, the legal authority to arrest." The court made clear however, that arrests under that statute are not *criminal* arrests. See id., 165 (noting that, "by its plain terms, New York's Criminal Procedure Law is inapplicable to custodial detentions under the Mental Hygiene Law . . . [and] courts have noted that conduct equivalent to mental illness which can result in custody under the Mental Hygiene Law cannot be considered an offense" [citation omitted; internal quotation marks omitted]). Further evidence that arrest under § 9.41 is not a criminal arrest is apparent in the fact that "the procedures employed by the police for [m]ental [h]ygiene pickups [under that statute] are significantly different [from] those employed in criminal matters." Id. The same is true with § 17a-503 (a); taking someone into custody under the statute does not trigger the same procedures that the police would be bound by during a criminal arrest. Therefore, even though mental health seizures have been described as "arrests," they are not criminal arrests.

Finally, we reject the plaintiffs' argument that those in custody under § 17a-503 (a) are subject to search incident to arrest because civil arrestees are subject to search incident to arrest in other contexts, such as civil immigration arrests or under the New York civil commitment statute. Those issues are not before the court. Even if a search may be possible in such contexts, it does not mean that it is mandatory. That is the relevant question in the present case.

Thus, we hold that the arrest policy does not impose a ministerial duty on officers to search those taken into custody pursuant to § 17a-503 (a). Lupienski was not taken into custody under the policy, and, therefore, he was not arrested and he was not subject to the search requirement.

II

The plaintiffs' second claim is that the police had a ministerial, nondiscretionary duty to search Lupienski under the transportation policy. See Police Policy, supra, 3.07. We disagree.[12]

The transportation policy states that, "[p]rior to transport, all prisoners shall be thoroughly searched for any weapons or contraband." Id., pt. IV, p. 1. According to the transportation policy statement of purpose, the policy is in place to "provide guidelines for transporting persons in the custody [of the] . . . officers." Id., pt. I, p. 1. The text of the prisoner transportation policy indicates that its purview is criminal and does not implicate mental health custody. For example, the policy requires officers to "handcuff (double-locked) all pris-

oners with their hands behind their back with palms facing outward." Id., pt. IV B, p. 1. There is an exception to this requirement for the "medically ill," but not for the psychiatrically disabled. Id., p. 2.

In the present case, Lupienski was not in custody or arrested within the meaning of the policy for the reasons discussed in the preceding section, and, therefore, the transportation policy is inapposite. There was no prisoner to search. Furthermore, the focus of the transportation policy on criminal arrest procedures, like handcuffing, illustrates that the policy is not intended to govern transport to the hospital pursuant to § 17a-503 (a).

According to the plaintiffs, the transportation policy has a broad definition of prisoner because it applies not only to those prisoners in custody, but also to those "awaiting interrogation, arrest processing, transfer to court, or other administrative procedures . . . ." Police Policy, supra, 2.01, pt. II, p. 1 (revised July 1, 2008). The plaintiffs' reliance on this language is misplaced because it comes not from the transportation policy, but rather from a separate chapter of the policy focused on prisoner holding facilities. Id. The full sentence states that "[i]t is the policy of this agency to provide secure temporary holding cells for prisoners awaiting interrogation, arrest processing, transfer to court, or other administrative procedures, and to maintain these facilities in a sanitary and safe manner." Id. This statement does not expand the definition of prisoner, or list reasons someone may be in custody, but merely details situations in which holding cells should be available to someone who is already a prisoner.

We therefore reject the plaintiffs' argument that Lupienski was a prisoner under the transportation policy and that, as a result, the officers were required to search him before sending him to the hospital. Accordingly, the trial court properly concluded that the defendant did not have a ministerial duty to search Lupienski under the policy when he was taken into custody pursuant to § 17a-503 (a) and properly granted the defendant's motion for summary judgment.

The judgment is affirmed.

In this opinion ROGERS, C. J., and PALMER, McDONALD, ROBINSON, and VERTEFEUILLE, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] General Statutes § 17a-503 (a) provides: "Any police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section. The officer shall execute a written request for emergency examination detailing the circumstances under which the person was taken into custody, and such request shall be left with the facility. The person shall be examined within twenty-four hours and shall not be held for more than seventy-two hours unless committed under section 17a-502."

[2] Erica Hull, Andrew Hull's wife, alleged loss of care, companionship, and consortium. She is also a party to this appeal. We refer to the plaintiffs individually by name when appropriate.

[3] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] A different section of the policy, entitled "Interrogations and Confessions," defines custody as existing when "an officer tells a suspect that he is under arrest." Police Policy, supra, 5.14, pt. III, p. 1 (revised May 6, 2008). In the present case, the plaintiffs' argument would fail under this definition unless Lupienski was explicitly told he was under arrest.

[5] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6] The plaintiffs warn that reading the arrest policy as limited to the criminal context would lead to absurd, illogical, and unworkable results. In particular, the plaintiffs list a range of custodial situations outside of the criminal context that would not be covered by the arrest policy, including failure to respond to a subpoena and debtors prison under the common law. Although we conclude that custody pursuant to § 17a-503 (a) is beyond the scope of the policy, it is irrelevant to this holding whether other civil forms of custody are within the scope of the arrest policy.

[7] General Statutes § 17a-503 (b) provides: "Upon application by any person to the court of probate having jurisdiction in accordance with section 17a-497, alleging that any respondent has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment in a hospital for psychiatric disabilities, such court may issue a warrant for the apprehension and bringing before it of such respondent and examine such respondent. If the court determines that there is probable cause to believe that such person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, the court shall order that such respondent be taken to a general hospital for examination. The person shall be examined within twenty-four hours and shall not be held for more than seventy-two hours unless committed under section 17a-502."

[8] It is telling that probate courts may issue warrants under § 17a-503 (b), because they do not have the power to issue criminal arrest warrants. See, e.g., General Statutes § 45a-98 (enumerating powers of probate court, none of which includes power to issue criminal arrest warrants); *In re Bachand*, 306 Conn. 37, 41–42, 49 A.3d 166 (2012) (probate courts " 'can exercise only such powers as are conferred on them by statute' ").

[9] General Statutes § 17a-503 (c) provides: "Any psychologist licensed under chapter 383 who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may issue an emergency certificate in writing that authorizes and directs that such person be taken to a general hospital for purposes of a medical examination. The person shall be examined within twenty-four hours and shall not be held for more than seventy-two hours unless committed under section 17a-502."

[10] General Statutes § 17a-503 (d) provides: "Any clinical social worker licensed under chapter 383b or advanced practice registered nurse licensed under chapter 378 who (1) has received a minimum of eight hours of specialized training in the conduct of direct evaluations as a member of (A) any mobile crisis team, jail diversion program, crisis intervention team, advanced supervision and intervention support team, or assertive case management program operated by or under contract with the Department of Mental Health and Addiction Services, or (B) a community support program certified by the Department of Mental Health and Addiction Services, and (2) based upon the direct evaluation of a person, has reasonable cause to believe that such person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may issue an emergency certificate in writing that authorizes and directs that such person be taken to a general hospital for purposes of a medical examination. The person shall be examined within twenty-four hours and shall not be held for more than seventy-two hours unless committed under section 17a-502. The Commissioner of Mental Health and Addiction Services shall collect and maintain statistical and demographic information pertaining to emergency certificates issued under this subsection."

[11] In the General Statutes, the term "custody" has a variety of different uses, many of which are not criminal custody or criminal arrests. See, e.g., General Statutes §§ 15-140c (f) (4), 22-329a and 46b-1.

[12] Because we conclude that this claim is meritless, we need not discuss the parties' arguments regarding whether the trial court improperly declined to consider it, as the plaintiffs contend. The defendant argues that the trial court was not required to consider the transportation policy argument because it was not raised in a timely manner or briefed adequately.

———————————————————————